HOWARD L. PERRY, an infant, by his next friend, OLIVER H. PERRY *vs.* THE HOUSE OF REFUGE.

*House of Refuge—Charitable Corporation—Officers—Assault—Damages—Fund in trust for Charity.*

The House of Refuge being a corporation instituted for charitable purposes, cannot be made liable in an action for damages, for an assault committed by one of its officers on an inmate of the institution.

Damages cannot be recovered from a fund held in trust for charitable purposes; they must be recovered from the wrong-doer.

APPEAL from the Circuit Court for Baltimore County.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., YELLOTT, MILLER, IRVING, RITCHIE, and BRYAN, J.

*Robert Biggs,* and *R. R. Boarman,* for the appellant.

*William Reynolds,* for the appellee.

YELLOTT, J., delivered the opinion of the Court.

The appellant instituted an action in the Circuit Court for Baltimore County, against the appellee for the recovery of damages; the plaintiff alleging in his declaration that on several occasions he was maliciously assaulted and beaten by the officers and agents of the defendant, a corporation, while in the regular course of their employment. It is apparent, from the evidence, that the appellant was beaten by teachers employed in the institution, and sustained serious injury in consequence of such treatment.

The Circuit Court rejected the prayers offered by the plaintiff, and, in conformity with the tenor of a prayer presented by the defendant, instructed the jury that the evidence in the cause was not legally sufficient to support the action. An instruction, thus eradicating the right of action, when brought under review, invokes the determination of questions relative to the responsibility of such corporations in actions of this nature.

With much earnestness of argumentation it has been contended that there can be no proper foundation for this action, because the House of Refuge is, like the Penitentiary of Maryland, an institution constituting a part of the government of the State, and therefore is not civilly liable in its corporate capacity for the tortious acts of its agents employed with a view to the efficient discharge of its public functions. There is, however, a widely perceptible dissimilarity between this corporation and the penitentiary. The latter is under the exclusive control of the government of the State. Its directors are appointed by the executive ; its other officers receive their appointments from the directors; are required to give bond, and the remuneration for their services is designated and established by statutory provisions by which the entire government of the institution is regulated and controlled. On the other hand the subscribers to the House of Refuge are declared, by the Act of incorporation, to be a body politic and corporate, and each subscriber, who pays the required sum, is constituted a member for life. The conduct of its affairs is entrusted to a board of twenty-four managers; and of this number ten are elected by the members of the association, ten chosen by the Mayor and City Council of Baltimore, and four appointed by the Governor of the State. Seven of these managers constitute a quorum for the transaction of business. They are authorized to make by-laws, ordinances and regulations, and to appoint officers, agents and servants, and to designate their duties. The

Mayor and City Council are authorized to appropriate any sum of money, not exceeding $25,000 towards defraying the current expenses of the House of Refuge and St. Mary's Industrial School, and pecuniary aid is also received from the Treasury of the State.

It does not follow, however, that because a number of the Board of Managers are appointed by the State, and others by the Mayor and City Council of Baltimore, that the corporation is thereby converted into a public institution.   In this Court and in those of other States, the exposition of principles, determining the *status* of such institutions in this respect, has been in an opposite direction.   It has been distinctly declared that the appointment of trustees and directors by State or municipal authority, to participate in the management, does not divest these associations of the attributes of private corporations, and clothe them with the immunities and privileges appertaining to public institutions.   *St. Mary's Industrial School for Boys vs. Brown, et al.,* 45 *Md.,* 330; *Nelson, &c. vs. Cushing, et al.,* 56 *Mass.,* 521.

It has been contended that a corporation cannot be made a defendant in an action of this nature; the remedy being solely against the individual who committed the wrong. Not until a comparatively recent period has the law, in this respect, undergone important mutations.   It was for a long time maintained as an undoubted principle that a corporation could neither sue nor be sued in an action of battery, the reason assigned being that a corporation could "neither beat nor be beaten in its body politic."   The enlightened jurisprudence of the present age has ignored such metaphysical subtilties, and recognized a rule more in conformity with the modern tendency to respond to the demand for substantial justice in every exigency.   It is now a principle, established by numerous adjudications, that if the servant of a corporation aggregate commit an assault by the authority of the corporation, an action of

trespass for assault and battery may be maintained against such corporation. And if the assault is committed on behalf of and for the supposed benefit of a corporation, the body politic, by ratifying the act, incurs the responsibility. *Moore vs. Fitchburg Railroad Corporation, et al.,* 4 *Gray,* 465 ; *Hewett vs. Swift, et al.,* 85 *Mass.,* 422.

In the consideration of questions of this nature it must not be forgotten that, in legal contemplation, a corporation is an artificial entity, and can only act through the intervention of its officers or agents. When the agent of an individual, acting within the scope of his designated duties, commits a trespass, the principal is constructively present and by implication authorizes and sanctions the act and thus incurs the legal responsibility. It is obvious that this principle is necessarily applicable in all suits against bodies politic and corporate. And it is important to advert to another fundamental rule. A corporate body is the mere creature of law ; deriving all its powers from the Act of incorporation and existing solely by legal sanction within the limits prescribed by legislative authority. Within its sphere of action it is liable for torts as well as for infractions of contract ; but beyond that point the individuals who participated in the pretended corporate acts are personally responsible. *Head & Amory vs. Providence Ins. Co.,* 2 *Cranch,* 127 ; *Rogers vs. Burlington,* 3 *Wall.,* 669.

But while an artificial being of statutory creation can only act within its assigned limits, it has all the powers either expressly given, or which are incidental to its existence and essential to its successful operation, and therefore necessarily created by implication. *The Trustees of Dartmouth College vs. Woodward,* 4 *Wheat.,* 636 ; *Thomas vs. West Jersey R. Co.,* 101 *U. S.,* 71.

The appellee being a body corporate, its authority to order or sanction the infliction of punishment by castigation, is a question which is presented for consideration.

If this authority exists at all, it exists by implication. It must be remembered that this is an institution of a peculiar character. It was founded as a place for the custody, care and reformation of unfortunate youths, either vagrants, convicts or such as are incorrigible by the ordinary discipline applied by parents and guardians.

It would seem to be an idle, nugatory and futile undertaking to create an institution for the purpose of reforming vicious youths, incorrigible by the exercise of parental authority, unless such institution is authorized to exert the same coercive powers of correction which are given by legal sanction to the natural guardian. A parent can inflict punishment, so that it be not excessive, and it is supposed to be his duty so to do when milder means of control are found to be ineffectual. By the creation of this corporation, the State has placed it *in loco parentis* as respects a vicious or incorrigible minor under its control. Its power to inflict punishment is derived by implication from the Act of incorporation. Authorized by the Act to adopt by-laws for its government, it has prescribed the mode in which corporal punishment is to be inflicted. None of the minors can be so punished except by an order of the visiting committee; and such punishment must be inflicted either by the superintendent, or by some one in his presence, acting under such order. Another by-law has for its special object, the protection of the inmates from acts of violence on the part of the officers and agents of the institution. It expressly prescribes as a rule, to be strictly observed, that, "no officer shall be allowed to strike, cuff, kick, or inflict any bodily punishment on any inmate."

Assuming the entire verity of the evidence adduced by the plaintiff, there is nothing in that evidence tending to show that the appellant was punished under an order of the visiting committee, by or in the presence of the superintendent. And if he was assaulted by any of the

officers or agents of the institution, it is not revealed by the record that such assault was authorized by the defendant, nor is its subsequent approval and sanction of such acts of aggression made apparent. And notwithstanding the exigency of the rule that the *allegata* must be supported by the *probata*, the averment in the declaration of culpable negligence on the part of the defendant is not established by any proof adduced by the plaintiff.

This record does not, therefore, present a case rendering the appellee obnoxious to the imputation of having either authorized or sanctioned the tortious acts of its agents, even if the applicability of the principle enunciated by the Supreme Court of the United States in *Phila. & Reading R. R. Co. vs. Derby*, 14 *Howard*, 484, should be recognized. Whether there is any perceptible analogy between that case, and the one disclosed by this record, need not now be made a matter of inquiry, for on another, and distinct ground obviously rests the final determination of this controversy. It has been urged, with much cogency in argument, that the organic principles on which this institution is founded, constitute it an eleemosynary corporation holding its estates and funds in trust for charitable purposes, and that it is not, therefore, responsible as a defendant in an action for damages. This question seems never to have been settled by adjudication in this State, and in an examination of authorities introduced from exterior sources, we are confronted by some diversity of opinion: When, in the absence of light, to be derived from domestic adjudication, this Court is embarrassed by an antagonism in the rulings, emanating from other jurisdictions, it must necessarily, by an eclectic method of appropriation, select, adopt, and be governed by, such decisions as are in consonance with that sound reason, which is said to be the life of the law, and which, therefore, affords the safest and most solid basis for a judicial determination.

It cannot be denied that the House of Refuge is an institution holding property contributed solely for benevolent purposes. If under the impulse of that humanity, which is the distinctive characteristic of the present age, associations are formed for the erection of hospitals with a view to afford relief to indigent sufferers from physical afflictions, it might with obvious propriety be suggested that an institution, originating in the co-operative action of benevolent individuals, and having for its object the amelioration of the condition of unfortunate minors who have become the victims of vicious habits and propensities, should be designated as a hospital for the cure of moral diseases. Youths, in whom the seeds of vice have already germinated, are placed there under proper restraint, so that the growth of crime may be arrested or eradicated in its incipiency. Funds are contributed by individuals impelled by philanthropic motives, and donations are obtained from the municipal and State treasuries. These are the funds of the institution, controlled by the managers, not for their own profit or benefit, but solely for the charitable purposes designated by its organic law. This then is an institution resting on an eleemosynary foundation. In *McDonald vs. Mass. General Hospital,* 120 *Mass.,* 432, it is held that a corporation, deriving its funds mainly from public and private charity, and holding them in trust for the object of sustaining the hospital, without expectation or right on the part of those immediately interested in the corporation to receive compensation for their own benefit, is a public charitable institution; and where it has exercised due care in the selection of its agents, it is not liable in an action for injury caused by their negligence.

In the case of *The Feoffees of Heriot's Hospital vs. Ross* in the House of Lords, it was decided that "if charity trustees are guilty of a breach of trust, the person thereby injured has no right to be indemnified by damages out of the trust fund."

Several of the most eminent Judges in England expressed themselves with much emphasis in opposition to an allowance of damages out of a fund so held by fiduciary agents.

Lord COTTENHAM said:

"There is a trust, and there are persons intended to manage it for the benefit of those who are to be the objects of the charity. To give damages out of a trust fund, would not be to apply it to those objects whom the author of the fund had in view, but would be to divert it to a completely different purpose."

Lord BROUGHAM concurred, and added:

"The charge is, that the governors of the hospital have illegally and improperly done the act in question; and therefore because the trustees have violated the statute, therefore—what? not that they shall themselves pay the damages, but that the trust fund which they administer shall be made answerable for their misconduct. The finding on this point is wrong, and the decree of the Court below as to the damages must be reversed."

The language of Lord CAMPBELL is even stronger and more emphatic. He said:

"It seems to have been thought, that if charity trustees are guilty of a breach of trust, the persons damnified thereby have a right to be indemnified out of the trust funds. That is contrary to all reason, and justice, and common sense. Such a perversion of the intention of the donor would lead to the most inconvenient consequences. The trustees would in that case be indemnified against the consequences of their own misconduct, and the real object of the charity would be defeated.   *   *   *   *   * Damages are to be paid from the pocket of the wrong-doer, note from a trust fund. A doctrine so strange as the Court below has laid down in the present case, ought to have been supported by the highest authority. There is not any authority, not a single shred, here to support it." 12 *Clark & Finnelly*, 507.

In the absence of any decisions in Maryland, we are constrained to adopt the exposition of principles by these eminent English Judges, and are thus led to the determination, that damages cannot be recovered from a fund held in trust for charitable purposes. In the language of Lord CAMPBELL, "the wrong-doer must pay from his own pocket."

The appellee was not, therefore, liable in this action, and there having been no error in the ruling of the Circuit Court its judgment must be affirmed.

*Judgment affirmed.*