# The Deaconess Home and Hospital v. Emelia Bontjes.

1. NUISANCES—*When Equity Will Take Jurisdiction.*—The ordinary rule is that if it is not clear that the thing complained of is a nuisance, equity will not take jurisdiction until the fact that it is a nuisance has been established at law. Where, however, the fact that it is a nuisance, is clear, and it is manifest that the injury resulting from the nuisance is irreparable, the modern rule is that equity will give relief at once.

2. SAME—*Municipality May Be Held Responsible Where a Hospital is Wrongfully Located or Conducted by it.*—Even a municipality, possessing the right of eminent domain and the police power, may be held responsible, where a hospital is wrongfully located or conducted by it, or is operated in an unwarranted manner or without due care and skill.

3. SAME—*Charitable Institution Subject to an Injunction Against the Continuance of a Nuisance.*—A charitable institution, even when not suable at law, is subject to an injunction against the continuance of a nuisance.

4. SAME—*Hospital Not a Nuisance Per Se.*—A hospital is not a nuisance *per se*, but it may be so located and conducted as to be a nuisance to people living close to it.

**Bill for an Injunction**, to restrain a nuisance. Appeal from the Circuit Court of Peoria County; the Hon. LESLIE D. PUTERBAUGH, Judge presiding. Heard in this court at the April term, 1902. Affirmed. Opinion filed October 14, 1902.

WINSLOW EVANS and SHEEN & MILLER, attorneys for appellant.

JAMES A. CAMERON, attorney for appellee.

MR. JUSTICE DIBELL delivered the opinion of the court.

Mrs. Emelia Bontjes, a widow, bought a half lot fifty feet wide and three hundred and twenty-three feet deep upon a bluff in a residence district in the city of Peoria, at a cost of over $5,000, and in 1894 built thereon a dwelling house which she has ever since occupied as her home. She also built a barn. She expended about $13,000 in improvements. Her family consists of herself, her daughter, her daughter's husband and their little child. When she bought this tract and built her house thereon the lot next east, one hundred feet wide, had upon it a brick house,

designed for and occupied by a private family. Its main rooms and most of its windows faced west. Mrs. Bontjes built her house with the rooms and windows mainly on the east side. Thus the living apartments and most of the windows of the two houses face each other. There is a space of thirty or thirty-five feet between the two houses, two or three feet of which is owned by Mrs. Bontjes and the rest is part of the lot on which the brick house stands. Next to the brick house is a walk by which to pass between the front and the rear of those premises, and between that walk and Mrs. Bontjes' lot line is a driveway for teams and carriages, used in connection with the brick house, and the only means of access to the brick house for conveyances. The front of each lot is occupied by a terraced slope to the street, which is nearly one hundred feet below. In October, 1898, a corporation was organized under the laws of this state, named " The Deaconess Home and Hospital of the Central Illinois Conference," having its office and principal place of business at Peoria. Its purpose was declared to be " to establish and maintain a Deaconess Home and Hospital in co-operation with the Methodist Episcopal Deaconess Society," and " to provide for and carry on all the varied religious, educational, humane and philanthropic work which may properly come within the province of such an organization in accordance with the discipline of the Methodist Episcopal Church of the United States." In November, 1898, the society purchased the brick residence and the lot on which it stood for $12,000, and established there a Deaconess Home. In the spring of 1900 it made some changes in the interior of the building, and on May 24, 1900, it opened there a hospital for the care and treatment of the sick and injured, which it has ever since maintained. On November 1, 1900, Mrs. Bontjes filed a bill in the court below to enjoin the Deaconess home from further carrying on and operating said home and hospital. The facts which she claimed entitled her to that relief are set out at length in the bill. The defendant answered, admitting some allegations and deny-

ing others. The cause was referred to a master to take and report proofs with his conclusions of law and fact. The proofs were taken from January to May, 1901. The master's report was in favor of complainant. Defendant filed objections thereto, which the master overruled. The report was filed in court, and defendant filed exceptions thereto. The court did not act directly upon these exceptions, but entered a decree finding the facts in detail, ending with the conclusion that defendant's hospital is a private nuisance and ought to be abated; that the equities are with complainant and she has no adequate remedy at law. It was decreed that defendant be permanently restrained from carrying on or operating a hospital in the building on defendant's said premises " during the continuance of the relative proximity of the complainant's said residence and the building of the defendant heretofore used on its said lot as a hospital, and of the present internal and external construction of defendant's said building." This is an appeal by defendant from said decree.

From the time the hospital was opened till the testimony was closed the hospital had been run at substantially its full capacity. During the first ten months it had one hundred and fifty to one hundred and sixty patients. The barn back of the brick house was made an annex to the hospital to increase its capacity. From complainant's living rooms, upstairs and down, the operations of the hospital were often visible day and night. What was said in the operating room during an operation in summer time, when the windows were necessarily open, was often heard in the bed rooms in complainant's house. The inmates of complainant's house, looking from its rooms, saw patients in the hospital entirely nude and others partially disrobed, while surgical and other operations were being performed upon them. They saw surgical instruments, naked human limbs held aloft, and a fountain syringe used upon patients. They saw the bedding changed under patients too ill to be removed from the bed. They heard moans and groans, and patients crying and vomiting. When surgical operations

took place at night they were performed under a bunch of six electric lights, which made complainant's rooms opposite light enough to read by, unless the reflection was excluded by keeping the shades down, which was not practicable in warm weather when ventilation made it necessary to keep complainant's windows open. Soiled and bloody bandages and other unsightly articles from the sick room were deposited in a receptacle in the back yard, and afterward taken out by a scavenger in such a way as to make the sight offensive. Whenever a patient died or recovered, the mattress, quilts and sheets, and the rubber cloth used on the patient's bed, were ventilated in the back yard near complainant's yard and in full view. As defendant's barn or annex was only fifty feet from the hospital proper the space for such ventilation was limited. This airing of bedding was of daily occurrence. The odor of iodiform and other drugs from the hospital pervaded complainant's house, passing through the open windows in the summer time, and through the cold air duct in the winter, this effect being afterward obviated for the winter by taking in the cold air for the furnace from a different side of the house. Ambulances conveying sick patients, or persons injured in accidents, came in over the driveway at all hours of the day and night, passing close to complainant's living rooms and bed rooms. Physicians were daily driving in over that driveway, hitching their horses there, and frequently driving away late at night or in the early hours of the morning, after attending patients and performing surgical operations. If it was warm weather complainant's windows were necessarily open, and also the hospital windows, and the sounds connected with the receipt and handling of persons seriously hurt or very ill, both outside and also inside the hospital, would very often be heard in complainant's house. From time to time coffins were brought to the hospital, and afterward removed with dead bodies in them. This was generally done at night, in which case complainant and her family were usually awakened by the noises, and aware of the cause. It has, however, been done several times during the

meal time, and the ambulance would be but a few feet from complainant's dining room. Sometimes the dead patient was not removed in a coffin but on a litter, the form showing through a cloth laid over the body. Patients who had sufficiently recovered to take exercise, were caused to walk back and forth between the houses attended and supported by a nurse. In such cases sometimes the patient was wrapped in a blanket, or the head was bandaged. In very warm weather patients were brought out and placed on the front porch or in the front yard, and placed in easy chairs and hammocks. The nurses fanned the patients, and administered medicines to them, and took their temperature, in the front yard. Women about to be confined, and who had come to the hospital for confinement, sat upon the front porch in hot weather, clad in loose garments. These uses by defendant of its front yard and porch precluded complainant and her family from using her adjoining front yard and porch, and especially were they debarred from entertaining their guests and callers upon her front yard and porch. We have not stated all the offensive details given in complainant's proof, but only an outline thereof. Defendant's proof did not overcome the case thus made. Two persons who have at different times acted as superintendent of the hospital testified they were unable to see how some of those things could have occurred, and that some others must have arisen from disobedience of rules by attendants; and officers of defendant expressed their desire to do what they reasonably could to avoid giving offense; but no substantial attempt was made to deny the main specific facts detailed in complainant's proof. The events and incidents we have referred to greatly disturbed the comfort and nerves and sleep of the inmates of complainant's home, and she and her family were greatly annoyed and distressed in mind. Complainant was deprived of the ordinary use and enjoyment of her property; In the main these sights and sounds and smells were not abnormal, but were the usual and necessary accompaniments of a busy hospital conducted with a view to the proper treatment of persons who are in great pain and distress.

Doubtless it is true the imaginations of complainant and her family added to their distress.  If they had been more stoical they would have suffered less.  But they could not help having imagination and nerves and human sensibilities. So, too, if they had not looked they would have been spared some painful and offensive sights.  But it was natural to look.  We are naturally concerned at the sufferings of fellow mortals in our immediate vicinity, and when we hear a human groan we naturally look to see what caused it. Some of the offenses complained of can be obviated to a greater or less extent; and something was done by defendant in that direction after this suit was begun.  It placed glazed glass in some of its windows, and double sash curtains.  These were calculated to shut out offensive sights, especially in winter.  But in summer the windows must be open to give fresh air to patients and attendants; and then groans and the other noises of the sick-room can be heard through them; and curtains can not be so disposed as to admit the daylight necessary for operations, and yet always exclude the view of a person from an opposite room so close by; and curtains will be moved aside by the wind; and they must often be drawn aside for more perfect ventilation, especially at the time of the daily airing of the rooms referred to in the evidence.  After this suit was begun defendant ceased the offensive handling of the bloody bandages in the back yard, and caused them to be burned instead.  An insane patient, confined upon these grounds two or three weeks, caused great disturbance by her cries, especially at night; but she was not known to be insane when received, and defendant does not intend to receive patients who are insane or who have contagious diseases. Some other matters of which complaint is made could be so conducted as to be much less obnoxious, without closing the hospital.

Yet it is evident that the main features which render a hospital so close to a dwelling house an intolerable nuisance and a destruction of the common comforts of home life, can not be removed while this hospital building is

constructed as it now is, and operated under existing conditions. The brick house was built to look out upon or open toward the place where complainant's house now stands. Complainant's house was built to look out upon or open toward the brick house. The space between is where both buildings get their light and air, and that space is so narrow, sounds and smells will travel across it. That space is the place where patients and physicians must enter and retire, and from which the dead bodies must go out. The windows of the hospital must often be open for necessary ventilation. The sunlight must be let in. Complainant can not shut her windows and draw down her shades and exclude the world three feet outside her windows. The sights and sounds of sick and wounded people going in, and of corpses being taken out, can not be avoided. The fact that an operation is being performed, and some of the sounds attending it, will inevitably reach the knowledge of the inmates of complainant's house. That patients who are able to be outdoors should enjoy the air of the porch and yard is desirable and necessary for them, but it destroys complainant's use of her porch and front yard for herself, her family, and her visiting friends. The simple reading of the proof in the record would seem sufficient to convince any one that the operation of this hospital can not fail to be a nuisance to the people who dwell in a house so extremely close, and that while the hospital is operated complainant's home is deprived of its main value.

It is true that if the brick house had continued to be occupied by a private family, there probably would have been sickness and death there, and complainant and her family would have been subjected to the attendant confusion and painful sensations and disagreeable sights; and she bought this lot and built her home so close with presumed knowledge that she must thus expose herself and family to occasional inevitable discomforts of that kind. But here the sights and sounds of sickness, suffering and death, are a matter of daily occurrence. Instead of the unusual and infrequent, they are the ordinary events. While human

Deaconess Home & Hospital v. Bontjes.

nature can recover from the unusual and unexpected occasional shock, it can not as well stand the strain of constant exposure to such depressing sounds and scenes. It is only by becoming hardened to human suffering that complainant and her family can cease to be injuriously affected by the daily occurrence of these sights and sounds under their eyes and within their hearing. But if the inmates of the complainant's home can become thus hardened, they ought not to be required to; and even then their home becomes a place where they can not invite their friends without subjecting them to great annoyance, especially in summer. True, a hospital is a great blessing to humanity. It ought to be fostered and encouraged. It is not a nuisance *per se*, but it may be so located and conducted as to be a nuisance to people living close to it. It is not necessary to the establishment of a hospital that it shall be placed upon a lot of ground so small that the inmates of the home near by must be subjected to close contact with the sufferings of its patients. Defendant knowingly put its operating room and the rooms where its patients were to be kept and treated within a few feet of the dining room, living room and bed rooms of complainant's family. It could have procured larger grounds for its hospital, where the inevitable pain and disorder would not have been in the immediate presence of neighbors. The health and comfort of complainant and her family are imperiled, and the reasonable use of her property as a home is denied her while this hospital is operated as described in the proof.

The ordinary rule is, if it is not clear the thing complained of is a nuisance, equity will not take jurisdiction till the fact that it is a nuisance has been established at law. Where, however, the fact that it is a nuisance is clear, and it is manifest the injury resulting from the nuisance is irreparable, the modern rule is for equity to give relief at once. We are of opinion the injury suffered by complainant is irreparable at law. Defendant argues here that it is a charitable institution and therefore not liable for the acts of its agents and employes, and that many of the things com-

plained of, if they occurred, arose from the neglect of such employes. To support this claim of non-liability, counsel for the hospital cite McDonald v. Mass. Gen. Hospital, 120 Mass. 432; Perry v. House of Refuge, 63 Md. 20; Downes v. Harper Hospital, 101 Mich. 555; and Hearns v. Waterbury Hospital, 66 Conn. 98. To these may be added Williamson v. Louisville Industrial School (Ky.), 23 L. R. A. 200, and cases cited in the note. The charter of defendant shows it was organized for religious, humane and philanthropic work. Its by-laws show both charity and pay patients are intended to be received. Applying to this case the principles laid down in the cases above cited, it follows that complainant has no remedy at law against this hospital for many of the grievances of which she complains. Without again recounting the offensive sights, sounds and smells already recited, it is apparent that some of them were due to the manner in which the servants, nurses and attendants, at the hospital, performed their duties. According to the doctrine laid down in the cited cases, complainant could not recover at law against the hospital for the injuries so caused to her. Nor would the right to sue at law each individual nurse or servant for each injury he or she may have occasioned to complainant, afford an adequate remedy. This would give rise to a multiplicity of suits, and it is obvious that in most cases it would be impossible for complainant to know what particular servant or attendant caused a particular injury to her. This remedy, also, would be only partial, and it would not cover those wrongs occasioned by the manner in which the trustees caused the hospital to be conducted. Even a municipality, possessing the right of eminent domain and the police power, may be held responsible, where a hospital is wrongfully located or conducted by it, or is operated in an unwarranted manner or without due care and skill, as is shown in Frazer v. City of Chicago, 186 Ill. 480. So far as complainant has any cause of action at law, it must be in part against defendant and in part a multiplicity of individual suits against servants and attendants. These suits can cover only part of complainant's

injuries.  The practical result of the continuation of the hospital as heretofore conducted, will be that complainant will be obliged to give up her home.  If she could recover from the hospital and from its servants and attendants compensation for the reduction in value of her property by the location of the hospital and the manner in which it has been conducted, still this would not adequately compensate her for the loss of the home of her selection.  The hospital can not exercise the right of eminent domain nor the police power, and without one or the other her home should not be made so uncomfortable she can not abide in it.  Even when a charitable institution is not suable at law, it is subject to an injunction against the continuance of a nuisance. Herr v. Central Ky. Lunatic Asylum, 28 L. R. A. 394.

It is urged complainant was guilty of laches in not commencing her suit before the hospital was opened, and in not sooner making complaint to defendant's officers.  The operation of the place at first as a home was not offensive. Complainant is not shown to have been so familiar with the operations of a hospital as to know in advance how greatly it would distress and injure herself and family.  It is obvious defendant would not have abandoned the purpose to open a hospital if complainant had requested it.  Complainant filed her bill five months and seven days after the hospital was opened.  She might well wait till fully advised of its ill effects upon herself and her property before resorting to litigation.  She did make complaint before she brought suit.  If she had complained sooner, only some lesser evils would have been corrected.  Perhaps the decree might properly have more clearly defined what changes would authorize defendant to resume its hospital, but appellant does not complain of the decree in that respect, and we therefore have not considered that feature.

The decree is affirmed.