Matthias, acting C. J.
The question raised by the pleadings is whether a corporation not for profit, which has as its purpose the maintenance and operation of a hospital, and whose funds and income are derived from private donations, public agencies and paying patients, is immune from liability as to a former patient who alleges that he was injured as a result of negligence on the part of the hospital while he was a patient therein. The question is raised by a demurrer to a separate answer filed by the defendant and is, thus, solely a pleading question.
The first case decided by this court in which the question was directly presented was Taylor, Admr., v. Protestant Hospital Assn., 85 Ohio St., 90, 96 N. E., 1089, 39 L. R. A. (N. S.); 427; decided in 1911, 45 years ago. The question has been reexamined by this court periodically, the last decision on the question being in the case of Newman, a Minor, v. Cleveland Museum of Natural History, 143 Ohio St., 369, 55 N. E. (2d), 575, decided in 1944, over 12 years ago.
The law on the immunity, partial immunity or nonimmunity from liability of organizations not for profit which maintain and operate hospitals, which law has never been what *469 might be described as “settled,” has been discussed, talked about and ruled on by many courts in the nation with many varied and divergent results. The question is again before this court for a timely re-examination.
It is interesting to note that many of the nation’s courts have, in the past 10 years, undertaken such re-examination. In Prosser on Torts (2 Ed., 1955), 787, Section 109, the situation is analyzed as follows:
“Prior to 1942 only two or three courts had rejected the immunity of charities outright. In that year a devastating opinion of Judge Rutledge in the Court of Appeals of the District of Columbia reviewed all of the arguments in favor of the immunity and demolished them so completely as to change the course of the law. It has been followed by a flood of recent decisions holding that a charity is liable for its torts to the same extent as any other defendant. In addition to the District, the immunity is now repudiated in Arizona, Alaska, California, Colorado, Delaware, Florida, Iowa, Kansas, Minnesota, New Hampshire, New York within the limits of its peculiar independent contractor theory, North Dakota, Oklahoma, Puerto Rico, Utah, Vermont, and Washington.
“The immunity of charities is clearly in full retreat; and it may be predicted with some confidence that the end of another decade will find a majority of the American jurisdictions holding that it does not exist.”
A review of the case of President and Directors of Georgetown College v. Hughes, 130 F. (2d), 810, discloses indeed a “devastating opinion of Judge Rutledge,” an opinion which is both well written and well reasoned.
Although it seems to be common knowledge that the rule of immunity of charitable associations, acknowledged to be first announced in America in McDonald v. Massachusetts General Hospital, 120 Mass., 432, 21 Am. Rep., 529, was derived from the findings of certain English cases which had been overruled prior to the derivation, a thorough study of such English cases discloses that the situation can not be better set out than as described as follows by Judge Rutledge in the Georgetown College case, supra:
“The foundation of immunity in this country is the dictum *470 of Lord Cottenham in The Feoffees of Heriot’s Hospital v. Ross, 1846, 12 Clark & Fin., 507, 513, 8 Eng. Reprint, 1508: ‘To give damages out of a trust fund would not be to apply it to those objects whom the author of the fund had in view, but would be to divert it to a completely different purpose.’ The action was for damages for wrongful exclusion from the benefits of the charity, not for personal injury inflicted in its operation. Previously, in Duncan v. Findlater, 1839, 6 Clark & Fin., 894, 7 Eng.. Reprint, 934, the same judge had uttered a similar dictum, and this was followed in Holliday v. St. Leonard, 1861, 11 C. B., N. S., 192. However, the dictum of Duncan v. Findlater was overruled by Mersey Docks Trustees v. Gibbs [1866], L. R. 1 H. L., 93, and the ruling of Holliday v. St. Leonard was reversed by Foreman v. Mayor of Canterbury [1871], L. R. 6 Q. B., 214.
“In this state of the English decisions, Massachusetts adopted the repudiated rule of Holliday v. St. Leonard in McDonald v. Massachusetts General Hospital, 1876, 120 Mass., 432, 21 Am. Rep., 529, and Maryland followed Heriot’s case in Perry v. House of Refuge, 1885, 63 Md., 20, 52 Am. Rep., 495. Apparently both courts acted in ignorance of the English reversal. In any event, they resurrected in America a rule already dead in England, and thereby gave Lord Cottenham’s dictum a new' lease on life in the New World.
“These facts have been the subject of comment. But it is not always noted that in Heriot’s case Lord Cottenham and his brethren did not purport to lay down, a rule of absolute immunity. They regarded exemption of the hospital’s funds as only an application of the well-settled law of trusts. The opinions are couched in trust, not corporate, terminology. Lord Cottenham thought to give damages would violate the trust purpose. Lord Campbell said it would pervert the intention of the donor. But he emphasized that it would indemnify ‘the trustees * * # against the consequences of their own misconduct * * * Damages are to be paid from the pocket of the wrongdoer, not from a trust fund.’ (Italics supplied.) As Lord Brougham put it, ‘because the trustees have violated the statute, therefore —what? not that they shall themselves pay the damages, but that the trust fund which they administer shall be made answerable for their misconduct.’’ (Italics supplied.) Seemingly all *471 regarded the hospital’s governors as being technically and substantially trustees of an express trust. On that theory and the fact that the governors themselves were charged with violating the statute, there was a source of reparation in their pockets. The victim would not be left with injury and without remedy. Unless trustees of a charity are treated differently from all others, that would be true in any case where the charity is organized technically as a trust.”
Following this lucid discussion, Judge Rutledge drew the obvious conclusion that, although even the overruled English cases anticipated a recovery from others than the tort-feasor, under an ordinary application of respondeat superior to the trustees therein involved, the transplantation of the rule into American jurisprudence, together with the emergence of the incorporated charitable institution, which by its very nature excludes its directors from individual, liability under respondeat superior, “strips the victim of 'all claim except against the negligent actor.”
Judge Rutledge further concluded:
‘ ‘ The fault in the foundation accounts in part for the weakness later disclosed in the structure erected on it.”
He then continued to explore and explode the various theories upon which courts have based findings of immunity, i. e., the “trust fund theory,” the theory under which the rule of respondeat superior is held inapplicable, the doctrine of “implied waiver,” and the general theory called “public policy.” As we have hereinbefore said, the question of the immunity or nonimmunity of nonprofit hospitals has been before this court several times, and an examination of those cases shows that in disposing of such question the court has applied the following language from the case of Taylor, Admr., v. Protestant Hospital Assn., supra, wherein the original rule of immunity was first established:
“But in this case it is sought to extend the rule [of respondeat superior] to masters different from others and who do ■not come within its reason * * * We think such extension is not justified. Public policy should and does encourage enterprises with the aims and purposes of defendant [nonprofit hospital] and requires that they should be exempted from the operation of the rule.” (Emphasis added.)
*472 Then, in a decision allowing recovery against a nonprofit hospital for negligence in failing to use ordinary care in selecting its servants, the court said in the opinion:
“Moreover, while it may well be said that donors of funds for the praiseworthy objects of charitable hospitals do not contemplate the diversion of the fund for the payment of damages for the numerous acts of servants referred to, yet they necessarily realize and appreciate that they give their donation to those who have the management and control of the institution, and that every principle of justice requires that they use care in the development and maintenance of the property and in the selection of servants who have the oversight of patients.” (Emphasis added.) Taylor v. Flower Deaconess Home and Hospital (1922), 104 Ohio St., 61, 135 N. E., 287, 23 A. L. R., 900.
Finally, in a case recognizing liability against a nonprofit hospital as to a nurse, employed by a patient, alleged to have been injured in an elevator in the hospital, this court said in the syllabus:
“Charitable institutions, public and private, are on the same basis as other corporations and individuals as to liability for negligence as to those who are not beneficiaries of the charity." (Emphasis added.) Sisters of Charity of Cincinnati v. Duvelius (1930), 123 Ohio St., 52, 173 N. E., 737.
It is seen from these quotations that this court has used terminology indicating clearly that behind the written words have been considerations of each of the above theories of immunity, often separately and, we think, not consistently.
Truly, as well stated by Judge Rutledge, these theories “are merely different names for the same idea, cast according to the predilection of the user for technical or for broader terminology”: “the ‘trust fund theory’ comprehends all that is involved in ‘public policy,’ with only an apparent difference in approach”; “and this is true likewise of ‘respondeat superior’ and ‘implied waiver.’ ”
It is interesting to note that this court in 1911 established a rule of full immunity from liability, made an exception to this rule in 1922 by recognizing liability against the charitable institution for injury caused by negligent selection of servants by such institution, and, in 1930, made a further exception by *473 recognizing liability against such institution as to strangers, i. e., those not beneficiaries of the charity./__It is seen that such findings exemplify the following statement by Judge Rutledge:
“Nevertheless, judicial discussion has set in the pattern that immunity is the rule, much of it without explicit recognition that the ‘rule’ itself is an exception to the general principles of liability.
“Notwithstanding the pattern, the ‘rule’ has not held the tests of time and decision. Judged by results, it has been devoured in ‘exceptions.’ ” (Emphasis added.)
Although it is apparent that this court has used language indicative of each of the four named theories of immunity, it is also apparent that, in the final analysis, the partial immunity of nonprofit hospitals obtaining in Ohio at the present time, they being immune from liability only as to patients, i. e., “beneficiaries of the charity” who cannot prove negligent selection of servants, is based solely upon the general ground of public policy. The question before us is thus refined to whether the reasons for the public policy, which to this point has made nonprofit hospitals immune from liability as to patients who cannot prove negligent selection of servants, still exist, if they ever did.
The determination of such question involves simply the balancing of two “rights.” On the one hand there is the well recognized right of nonprofit hospitals to any benefit and assistance which society and the law can justly allow them — a right which they command by their very nature; and on the other hand we see the right of the individual injured by the negligence of a servant to look for recompense to the master of such servant, under respondeat superior.
Up to this point in the development of the law, this court has apparently felt that the benefit to society as a whole, gained by granting immunity, weighed the former right in favor of the latter, and this was on the ground that such masters were “different from others,” and that immunizing them was “a valuable aid in securing the ends of justice.”
In our opinion this conclusion is no longer justified.
Judicial attention is forced to the political cognizance, in the form of legislation, of the social consciousness of present day *474 government. Such consciousness is evidenced by legislation providing for aid for the aged (see Section 5105.07, Revised Code), aid for dependent children (see Section 5107.10, Revised Code), reimbursement to hospitals for indigents injured by motor vehicles (see Sections 4515.03 to 4515.11, Revised Code), care for crippled children (see Sections 5103.12 and 5103.13, Revised Code) and poor relief (see Sections 5113.01, 5113.03 and 5113.04, Revised Code). In each of such aid programs there is provision for payment of hospital bills for beneficiaries.
We note also the prevalence of hospitalization insurance, both .group and individual. It has been estimated that in 1955 approximately one-half of the gross charges incurred by patients in American hospitals were paid by insurance benefits.See Statistical Abstract of the United States (1955), 78 table 84.
The effect of this, of course, is to provide the modern nonprofit hospital with a much broader base of payment for services rendered than had the hospital of 50 years ago. It is also noted that the average nonprofit hospital of today is a large well run corporation, and, in many instances, the hospital is so “businesslike” in its monetary requirements for entrance and in its collections of accounts that a shadow is thrown upon the word, “charity,” and the base of payment mentioned above is broadened still more.
As hereinbefore indicated, the “trust fund theory” does not and cannot be said to obtain in Ohio by virtue of the cases of Taylor v. Flower Deaconess Home and Hospital and Sisters of Charity of Cincinnati v. Duvelius, supra. If the hospital and its funds are held subject to liability as to one or two classes of persons, i. e., those injured by virtue of the negligent selection of servants and strangers who are injured, then the hospital and its funds cannot be held immune as to others on the “trust fund theory,” by which the funds would be kept intact at all costs. This court has affirmatively decided that the hospital is subject to liability as to certain classes of persons.
The policy that the funds of a nonprofit hospital should not be diverted for any purpose other than the purpose for which it. was organized, causing a depletion of the hospital’s resources, and thus immunizing them from liability no longer has any *475 foundation in our present day economy. Under present day conditions a hospital may fully protect its funds by the use of liability insurance, and, since such funds may be used to recompense -those who are injured through the negligent selection of servants and strangers, there is no reason why such funds may not be used in the purchasing of insurance which will protect not only the hospital and its funds but also any person injured through its negligence or the negligence of its servants.
In mentioning insurance we call attention to the fact that the present discussion does not concern the imposition of liability where none theretofore existed. It concerns, rather, the public policy which has heretofore held institutions such as the defendant immune as to beneficiaries, under a liability which is pre-existent under the ordinary rule of respondeat superior. We emphatically state that we are not imposing a liability heretofore nonexistent merely because it may be indemnified by insurance.
- What we do find with regard to this aspect is that the availability of liability insurance and the existing power to purchase it with hospital funds, coupled with the increased base of remuneration for services rendered and the efficient businesslike management of modern hospitals, certainly tend to negate the argument that to hold the hospital amenable, under the doctrine of respondeat superior, to damages for injuries to patients caused by the negligence of its servants would be such a detriment as to defeat the charitable purpose for which it was organized and incorporated.
Let us for a moment consider the other side of the picture —the patient injured, killed or maimed by the negligence of servants of the hospital.
This court alone has considered cases involving the following:
In the first Taylor case the allegation was that a nurse had, by negligence in counting the sponges used in an operation, allowed a sponge to remain in the patient’s body, causing her death.
In the second Taylor case a student assistant was alleged to have negligently administered to the patient an injection *476 of scalding hot water immediately following an operation on him for appendicitis and while he was under the influence of ether.
In the case of Lakeside Hospital v. Kovar, Admr., 131 Ohio St., 333, 2 N. E. (2d), 857, it was alleged that the patient died by virtue of the negligent infusion of boric acid instead of a saline solution.
Although we do not attempt to say that the hospital would be liable in damages under respondeat superior in all those cases, they are certainly indicative of the damage and suffering which can be caused not only to the patient who ordinaiily is helpless to act in his own behalf, but to his children and family. To say that such damages are ordinarily compensable is a gross understatement, and, in each case, if the negligence is proved, the actual tort-feasor is liable.
The point to be derived, however, is that if a patient is injured or killed by the negligence of such a servant the chances are high that as a direct result he or the members of his family will become dependent upon some other nonprofit institution organized for charitable purposes, unless recovery may be had against the hospital under the doctrine of respondeat superior.
. Thus we agree with the statement of Judge Johnson, writer of the opinion in the first Taylor case, that “the ends- of justice are best secured by holding the master responsible for the wrongful acts of his servant,” and that “public policy should and does encourage enterprises with the aims and purposes of defendant.” We must disagree, however, with his conclusion that public policy goes so far as to exclude nonprofit hospitals from the operation of the rule of respondeat superior. Whatever the reason for the public policy that gave rise to the rule of immunity, public policy today, examined in the light of present day conditions, will not support such a rule.
We cannot state our general position on this question more clearly than did Judge Rutledge state his, as follows:
“The law’s emphasis ordinarily is on liability, not immunity, for wrongdoing. Respondeat superior has widened it in an institutionally, and to a large extent corporately, organized community. Charity is generally no defense. When it has been organized as a trust or corporation, emphasis has shifted from liability to immunity. The conditions of law and of fact which *477 created the shift have changed. The rule of immunity is out of step with the general trend of legislative and judicial policy in distributing losses incurred by individuals through the operation of an enterprise among all who benefit by it rather than in leaving them wholly to be borne by those who sustain them. The rule of immunity itself has given way gradually but steadily through widening, though not too well or consistently reasoned, modifications. It is disintegrating. Each modification has the justification that it is a step in result, if not in reason, from the original error toward eventual correction. As more and more steps are taken, correction becomes more complete. The process is nearing the end. This leaves the steps untaken standing out as the more anomalous.
‘ ‘ * * * Insurance must be carried to guard against liability to strangers. Adding beneficiaries cannot greatly increase the risk or the premium. This slight additional expense cannot have the consequences so frequently feared in judicial circles, but so little realized in experience. To offset the expense will be the gains of eliminating another area of what has been called ‘protected negligence’ and the anomaly that the institutional doer of good asks exemption from responsibility for its wrong, though all others must pay. The incorporated charity should respond as do private individuals, business corporations and others, when it does good in the wrong way.”
Thus, in an action to recover damages for injury to a patient alleged to have been caused by the negligence of a nonprofit hospital, an answer filed by the defendant, which alleges that it is a corporation not for profit maintaining and operating a public charitable hospital, does not state a defense and is subject to demurrer. Any further finding regarding the liability of the defendant in the instant case would be mere obiter dictum, since we have no facts before us other than those admitted for the purpose of plaintiff’s demurrer, i. e., that the defendant is .a corporation not for profit maintaining and operating a public charitable hospital. We, thus, conclude that a corporation not for profit, which has as its purpose the maintenance and operation of a hospital, is, under the doctrine of respondeat superior (and the various rules and exceptions applicable thereto), liable for the torts of its servants, and leave for future de *478 termination the application of this doctrine to the facts of the instant case as may be proved on trial. For instance, we are not deciding that persons working in a hospital, snch as doctors and nurses, under circumstances where the hospital has no authority or right of control over them, can bind, the hospital by their negligent actions. See Schloendorff v. Society of New York Hospital, 211 N. Y., 125, 105 N. E., 92, 52 L. R. A. (N. S.), 505.
The present case has to do only with the pleadings and does not extend beyond the question of the liability of a hospital for the negligence of those employees who can and do make the hospital answerable for their actions under the doctrine of respondeat superior.
It follows that the demurrer to defendant’s separate answer should have been sustained. The judgment of the Court of Appeals is, therefore,, reversed and the cause remanded to the trial court for further proceedings not inconsistent herewith.

Judgment reversed and cause remanded.

Hart, Zimmerman, Stewart and Bell, JJ., concur.
Collier and Putnam, JJ., dissent.
Matthias, J., sitting in the place and stead of Weygandt, C. J., pursuant to Section 2503.04, Revised Code.
Collier, J., of the Fourth Appellate District, and Putnam, J., of the Fifth Appellate District, sitting by designation in the place and stead of Matthias and Taft, JJ., pursuant to Section 2, Article IV of the Constitution.