JOHN JONES, AN INFANT, BY HIS GUARDIAN AD LITEM, JOSEPH JONES; JOSEPH JONES AND BEATRICE JONES, FATHER AND MOTHER, JOINTLY; AND JOSEPH JONES, INDIVIDUALLY, PLAINTIFFS-APPELLANTS, v. ST. MARY'S ROMAN CATHOLIC CHURCH, OPERATING UNDER THE STYLE AND NAME OF ST. MARY'S ROMAN CATHOLIC SCHOOL (GRAMMAR), DEFENDANT-RESPONDENT.

Argued May 7, 1951—Decided June. 29, 1951.

534

*Mr. Sylvester S. Garfield* argued the cause for the appellants.

*Mr. Allen C. Mathias* argued the cause for the respondents (*Messrs. Smith, James and Mathias,* attorneys).

The opinion of the court was delivered by

BURLING, J.   This appeal involves a civil action sounding in tort and grounded in the alleged actionable negligence of the defendant, proximately resulting in injuries sustained by the infant plaintiff, John Jones.   Plaintiffs instituted their action in the Law Division of the Superior Court, Bergen County, suffered an adverse judgment and addressed this appeal therefrom to the Appellate Division of the Superior Court; prior to hearing there, the appeal was certified to us on our own motion.

The infant plaintiff, a boy 12 years of age, allegedly was injured by a fellow pupil while both were in attendance at a parochial school conducted by the defendant in the Borough of Rutherford, Bergen County, New Jersey.   He brought suit in the Law Division of the Superior Court and his par-

ents also, *per quod*, against the defendant, alleging the breach of duty on the part of its agent, one of its instructors. The defendant, after the pleadings were closed, moved for summary judgment under *Rule* 3:56, upon the ground, raised as a defense in the answer, that it was a charitable corporation or eleemosynary institution and the plaintiffs were beneficiaries of said charity at the time of the incident allegedly resulting in injury to the infant plaintiff. It was stated in the notice of motion that defendant would rely on depositions previously taken of plaintiffs John Jones and Joseph Jones and upon an affidavit of the administrator of the defendant having incorporated therein a certified copy of the defendant's certificate of incorporation. Plaintiffs served an opposing affidavit on defendant's counsel on the day of the argument on the motion. The defendant's motion was granted by the trial court and judgment in favor of defendant was entered on January 31, 1951. Plaintiff instituted an appeal from this judgment to the Appellate Division of the Superior Court and while pending consideration there said appeal was certified to this court upon our own motion as hereinbefore mentioned.

The doctrine of immunity seems to have had its first application in our State, in a decision of a court of last resort, in *D'Amato v. Orange Memorial Hospital*, 101 *N. J. L.* 61, 63, 65 (*E. & A.* 1925), a unanimous decision of the 15 members of the court who considered the appeal. In the opinion the court in the *D'Amato* case reviewed decisions in other states, and concluded that (*p.* 65):

"In our opinion, public policy requires that a charitable institution maintaining a hospital be held not liable for injuries resulting to patients through the negligence or carelessness of its physicians and nurses, even if the injured person were a pay patient—payment for board, medical services and nursing in such case going to the general fund to maintain the charity."

In the *D'Amato* case, *supra*, the court assigned no specific grounds or sources as the basis for its declaration of public policy, but the declaration is understood to be a statement

of a common law principle that it would be contrary to the interests of society that funds dedicated to a charitable use be permitted to be diverted or diminished by the payment of judgments resulting from the torts of agents, servants or employees of the organization or institution administering the charity where suit is instituted by the beneficiary of the charity. This position is borne out in the opinion in *Simmons v. Wiley M. E. Church,* 112 *N. J. L.* 129, 132 (*E. & A.* 1934) wherein it was held (*p.* 132):

"Now, it is quite within reason to declare that public policy forbids a charitable institution being held constantly to the danger of damages for untoward results in some of the continuous ministrations to the direct beneficiaries of its charitable contributions; but such a rule is not invoked with equal justice, nor indeed by virtue of any public requirement, in the case of tortious injuries to those outside of its benefits, neither seeking nor receiving the same. It may well be sound public policy to avoid a diversion of trust funds from the direct object of their charitable donor by forbidding their application to damages for the negligence of the charity's servants where the injured party participates in the charity's bounty, but no charitable organization, no matter how lofty in character the motive or purpose, should be permitted with impunity to set up and operate machinery and thereby injure by negligence those unconcerned in and unrelated to that which the donor brought into being or supports in operation."

And in *Kolb v. Monmouth Memorial Hospital,* 116 *N. J. L.* 118, 119-120 (*E. & A.* 1936) the common law principle was summarized and defined as follows:

"In our state we have adopted and followed, what we believe to be the majority view, *i. e.,* the public policy theory. Thus we deny the right of recovery on the part of those who have a valid claim against a charitable institution, based on actionable negligence, but who are either the recipients of the benefactions, or the beneficiaries of the charitable institution sought to be held liable; but we permit the right of recovery against charitable institutions, for their actionable negligence on the part of 'those unconcerned in and unrelated to that which the donor brought into being and supports in its operation.' *Simmons v. Wiley Methodist Episcopal Church,* 112 *N. J. L.* 129, 170 *A.* 237."

This qualified immunity doctrine was also affirmed in *Boeckel v. Orange Memorial Hospital,* 108 *N. J. L.* 453 (*Sup.*

*Cl.* 1932), affirmed 110 *N. J. L.* 509 (*E. & A.* 1933); *Bianchi v. South Park Presbyterian Church,* 123 *N. J. L.* 325, 332 (*E. & A.* 1939) and *Rose v. Raleigh Fitkin-Paul Morgan, &c., Foundation,* 136 *N. J. L.* 553, 554-555 (*E. & A.* 1948). The various arguments advanced by the plaintiffs do not warrant us in departing from this common law rule which has been consistently adhered to by our courts for 25 years since it was recognized and declared in this State.

■ Plaintiff asserts that we should re-examine the rule and the policy behind it, and determine that the rule does not apply where actions complained of constitute administrative acts, breach of contract, or the maintenance of a nuisance. We do not find allegations in the complaint which may properly be said to raise an issue of breach of contract, nor of maintenance of a nuisance. Further as to the plaintiffs' suggestion that the immunity rule does not extend to acts or omissions constituting administrative negligence, we are asked thereby to modify the established common law rule in this State. There is no merit in this contention. There can be no logical distinction between the tortfeasors when all act under the charitable corporation. The corporation acts, through its servants or agents, whether they be directors, trustees or instructors. *Cf. Fair v. Atlantic City Hospital,* 25 *N. J. Misc. Rep.* 65 (*Circuit Court* 1946); *Roosen v. Peter Bent Brigham Hospital,* 235 *Mass.* 66, 126 *N. E.* 392 (*Mass. Sup. Ct.* 1920).

On the factual aspect of the matter before us we are presented with the question whether the defendant was sufficiently shown to be an eleemosynary institution within the protection of the immunity rule upon a motion for summary judgment, under *Rule* 3:56–3.

■ We find that a consideration of defendant's affidavit in support of the motion, plaintiffs' affidavit in opposition to the motion, depositions taken before the argument and the pleadings show palpably no genuine issue of fact in relation to the status of the defendant. The defendant's certificate of incorporation shows that the defendant was incorporated

under the act of April 9, 1875, entitled "An act to incorporate trustees of religious societies," *Rev. of* 1871-77, *p. 958*, the language of which is identical with that of an act of April 17, 1846, *Rev. Stat.* 1846-1847, *p.* 152, which was considered by the former Court of Errors and Appeals in *Bianchi v. South Park Presbyterian Church, supra,* at *pp.* 327-331. In the *Bianchi* case, *supra,* it was held that a religious society incorporated under the 1846 act is an eleemosynary institution within the scope of the immunity doctrine, that "The propagation of religion is now regarded as investing such societies with the attributes of a charitable institution." The following excerpt from the opinion of Mr. Justice Heher, speaking for the court in the *Bianchi* case, *supra,* at *pp.* 331-332, is appropriate here:

"In the Dartmouth College case, Chief Justice Marshall declared that 'almost all eleemosynary corporations, those which are created for the promotion of religion, of charity or of education are of the same character. The law of this case is the law of all.' *Trustees of Dartmouth College v. Woodward,* 4 *Wheat.* 518, 645; 4 *L. Ed.* 629, 661. And in the later case of *Society for Propagation of the Gospel in Foreign Parts v. Town of New Haven,* 8 *Wheat.* 464; 5 *L. Ed.* 662, Mr. Justice Washington classified as a 'private eleemosynary corporation,' created for the 'administration of a public charity,' the plaintiff corporation, which came into corporate being under a charter granted by King William III to a number of resident subjects of England for the purpose of making 'better provision * * * for the preaching of the gospel, and the maintenance of an orthodox clergy in the colonies of Great Britain.' It was pointed out that 'the endowment of the corporation was to be derived solely from the benefactions of those who might think proper to bestow them, and to this end the society was made capable to purchase and receive real estates, in fee, to a certain annual value (as was the case with the cited New Jersey statute of 1846, although the limitation did not apply to real estate alone), and also estates for life, and for years, and all manner of goods and chattels to any amount.'

Thus it is that the test of a charity in the legal sense is whether its beneficence falls upon a class sufficiently large and indefinite as to be fairly termed of common and public incidence; and the defendant corporation answers that description."

The affidavit of Reverend Sokolich, administrator of the defendant, shows that the funds, means and income of

the defendant are derived from charitable contributions, gifts and imposts levied on and donated by its members and others of the same religious persuasion; that the funds so derived are devoted entirely to the propagation and advancement of religion, education and the charitable work commonly carried on by religious orders; that no part of the funds or property of defendant is applied to the private profit of any person, corporation or group; and that the school in which the infant plaintiff is alleged to have been injured has no independent organization, funds, property or existence and is maintained and operated solely by the defendant out of church funds, no profit being made or enuring to the benefit of any person or corporation. as a result of the schools' maintenance and operation by the defendant. The proof adduced by the depositions shows that the infant plaintiff attended school and studied for confirmation in the religious concepts propagated by defendant at defendant's institution; that the defendant's school accorded its pupils religious and secular instruction; that half the tuition for the infant plaintiff was paid by the pastor of Sacred Heart Church, Lyndhurst, New Jersey, which was the church attended by plaintiffs, and half by the parents of the infant plaintiff, but defendant "never pressed  *  *  *  hard for the money  *  *  *."

The facts show palpably that there was no genuine issue as to any material fact challenged and under such circumstances it devolved upon the court to declare the judgment which the law imposes.

For the reasons above stated, the judgment of the Law Division of the Superior Court is affirmed.

*For affirmance*—Justices CASE, HEHER, OLIPHANT, WACHENFELD and BURLING—5.

*For reversal*—Chief Justice VANDERBILT, and Justice ACKERSON—2.