RICHARD E. SCHULTZ, AS ADMINISTRATOR OF THE ESTATE OF CHRISTOPHER SCHULTZ, RICHARD E. SCHULTZ, AS THE FATHER AND NATURAL GUARDIAN OF RICHARD SCHULTZ, RICHARD E. SCHULTZ, INDIVIDUALLY, AND MARGARET SCHULTZ, PLAINTIFFS-APPELLANTS, v. THE ROMAN CATHOLIC ARCHDIOCESE OF NEWARK, DEFENDANT-RESPONDENT.

Argued September 12, 1983—Decided March 19, 1984.

David Jaroslawicz, a member of the New York bar, argued the cause for appellants (*Hartstein & Hartstein*, attorneys; *David Hartstein*, on the brief).

Thomas J. Herten argued the cause for respondent (*Breslin, Herten & Le Pore*, attorneys; *Louis L. D'Arminio*, on the brief).

Edward J. Leadem submitted a brief on behalf of *amicus curiae*, New Jersey Catholic Conference.

The opinion of the Court was delivered by

O'HERN, J.

We granted certification, 93 *N.J.* 246 (1983), limited to the issue of whether the Charitable Immunity Act, *N.J.S.A.* 2A:53A–7 to –11, bars a claim by a beneficiary of a charitable institution based on the charity's alleged negligence in hiring.

Although the defendant charity asserts that it took no part in the hiring of the individual whose actions allegedly caused the grievous injuries inflicted here, because the case is before us to review a grant of motion for summary judgment, we must assume for purposes of review that the facts as alleged are true. All inferences of doubt are to be drawn in favor of the plaintiffs. Only when the pleadings, affidavits, and exhibits supporting the motion show a palpable absence of disputed material facts may judgment be granted. *Judson v. Peoples Bank & Trust Co. of Westfield*, 17 *N.J.* 67, 74–75 (1954). Therefore, we take no action on the motion of *amicus curiae*, New Jersey Catholic Conference, to supplement the record by affidavit to show diocesan hiring practices, because a genuine issue would still remain as to facts that must be accepted as true for the purpose of summary judgment.

The facts alleged are that Christopher Schultz, age 11, was a student at a parish school owned, operated, and controlled by the defendant charity, Roman Catholic Archdiocese of Newark. It is further alleged that the Franciscan Brothers of the Poor were engaged by the Archdiocese to supply instructors for the school. It is alleged that the defendant employed one such Franciscan, Robert Coakley, known as Brother Edmund, as an instructor at the school and as a scoutmaster for the Boy Scout group sponsored by the parish.

During the spring and summer of 1978, Coakley operated the Boy Scout camp that Christopher Schultz attended. It is alleged that while at this camp, in July 1978, Coakley forced Christopher to engage in sexually provocative activities and in sexual contact with him. Coakley threatened Christopher not to reveal what had occurred. These deviant actions and threats continued after the school year started. In the late fall of 1978, Christopher told his parents what had happened. They immediately notified the Archdiocese.

Throughout the winter and spring of 1979, Christopher received extensive psychiatric and medical care and was hospitalized. Finally, in May 1979, Christopher committed suicide by taking drugs.

Following Christopher's death, this action was brought, alleging that the defendant was reckless, careless, and negligent in hiring Coakley and permitting him to have young boys under his care, in failing to determine his prior employment history, in failing to supervise him, and that the defendant was otherwise negligent. Christopher's parents seek compensation for his suffering and death and for their own damages. The complaint also seeks medical expenses and damages on behalf of Christopher's brother, Richard Schultz, who attended the same camp and feels responsible for his brother's death.

The defendant moved to dismiss the complaint pursuant to *R.* 4:6–2(e), on the ground that the complaint failed to state a claim

upon which relief could be granted, and also moved for summary judgment under *R.* 4:46–2.

The defendant's primary point was that the plaintiffs' complaint was barred by the New Jersey Charitable Immunity Act, *N.J.S.A.* 2A:53A–7 to –11.

The trial court granted defendant's motion to dismiss the complaint based on the Charitable Immunity Act. The Appellate Division affirmed on that issue and on certain constitutional issues raised on appeal. We granted limited certification to review the issue of negligent hiring under the statute. 93 *N.J.* 246 (1983).

The common law doctrine of charitable immunity was abolished in this State in 1958. *Benton v. YMCA,* 27 *N.J.* 67 (1958); *Collopy v. Newark Eye and Ear Infirmary,* 27 *N.J.* 29 (1958); *Dalton v. St. Luke's Catholic Church,* 27 *N.J.* 22 (1958). The Legislature responded to these decisions by adopting *N.J.S.A.* 2A:53A–7 to –11.

*N.J.S.A.* 2A:53A–7 provides:

No nonprofit corporation, society or association organized exclusively for religious, charitable, educational or hospital purposes shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation, society, or association or of its agents or servants where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association; but nothing herein contained shall be deemed to exempt the said agent or servant individually from their liability for any such negligence.

Judge, later Justice, Pashman described this statute as having "reinstated the common law doctrine as it had been judicially defined by the courts of this State" prior to *Collopy*. *Wiklund v. Presbyterian Church of Clifton,* 90 *N.J.Super.* 335, 338 (Cty.Ct. 1966) (citing *Anasiewicz v. Sacred Heart Church,* 74 *N.J.Super.* 532 (App.Div.), certif. den., 38 *N.J.* 305 (1962)). Under this analysis we are urged to find that the Legislature crystallized

the law as of 1958 and that it is our role to carve out of the statute those exceptions that would have been then recognized.

In New Jersey the central common law exception to immunity allowed "strangers" to a charity—those who gained no benefit—to recover damages for negligence. *See Collopy,* 27 *N.J.* at 37; *Lindroth v. Christ Hosp.,* 21 *N.J.* 588, 592–93 (1956). Plaintiffs urge that there existed as well a common law exception from immunity for administrative negligence. The exception finds support in one case, *Fields v. Mountainside Hosp.,* 22 *N.J.Misc.* 72 (Cir.Ct.1944), in which that court allowed an allegation of administrative negligence to survive a motion to dismiss. But a later Supreme Court decision disapproved that exception:

> Further as to the plaintiffs' suggestion that the immunity rule does not extend to acts or omissions constituting administrative negligence, we are asked thereby to modify the established common law rule in this State. There is no merit in this contention. There can be no logical distinction between the tortfeasors when all act under the charitable corporation. The corporation acts, through its servants or agents, whether they be directors, trustees or instructors. [*Jones v. St. Mary's Roman Catholic Church,* 7 *N.J.* 533, 538 *cert. den.,* 342 *U.S.* 886, 72 *S.Ct.* 175, 96 *L.Ed.* 664 (1951).]

As to negligent hiring, the court in *Woods v. Overlook Hosp. Ass'n,* 6 *N.J.Super.* 47 (App.Div.1949), observed that even assuming such an exception existed, there was no evidence to support it in the case. Thus prior to the enactment of the statute, it simply was not true that administrative negligence, also called negligent hiring, was an exception to charitable immunity. In *Jones,* the Court sustained the dismissal of a complaint that alleged administrative negligence of a parochial school in the hiring and training of a teacher. That Court relied on two other cases that rejected the cause of action, *Fair v. Atlantic City Hosp.,* 25 *N.J.Misc.* 65 (Cir.Ct.1946), and *Roosen v. Peter Bent Brigham Hosp.,* 235 *Mass.* 66, 126 *N.E.* 392 (1920). *Jones,* 7 *N.J.* at 538.

Plaintiffs further argue that because one of the statute's purposes was to relieve a charity from liability based upon principles of *respondeat superior, see Collopy,* 27 *N.J.* at 39, it is inapplicable to negligent hiring. Under *respondeat superior,* an

employer is liable only for those acts of his employee committed within the scope of employment, while negligent hiring reaches further to cover acts outside the scope of employment. *See DiCosala v. Kay*, 91 *N.J.* 159, 172–73 (1982). Therefore, it is said, immunity is not available.

Our dissenting colleagues advance a related theory. The argument has attraction because our natural sympathies favor the result, but it presents problems of consistency. It suggests that immunity is lost when the tort is intentional, since the statutory immunity refers consistently and exclusively to "negligence." Thus the fact that the ultimate act that did the damage was intentional takes the entire incident out of the statute in the dissent's view. That would make the church, protected in the past by the common law immunity and now by statutory immunity, more vulnerable than private entities protected by neither common law nor statutory immunity.[1] The dissent asks us to assume that the Legislature decided to disregard all other aspects of the tort and simply focus on the final action. Its premise is that the Legislature, having removed liability for the most likely situations, implicitly would restore liability for the most unlikely situations. Would not the same logic also apply had the sexual crime been committed by an unsupervised fellow student. Yet in *Jones,* the negligent failure to avert the commission of an intentional act by a fellow student did not impose liability. 7 *N.J.* at 538.

At root is the dissent's notion that the church should be liable when its employees are not pursuing the business of charity: "It is evident that in the commission of an intentional tort, the

---

[1]The dissent emphasizes the distinction between intentional and negligent torts, but in our cases involving ordinary employers we ask instead whether the tort occurred within the scope of employment. If so, there is liability, whether the tort is negligent or intentional. In practice, only rarely do intentional torts fall within the scope of employment. *See Gibson v. Kennedy,* 23 *N.J.* 150 (1957) (railroad liable for employee who assaulted fellow employee during dispute as to his right to ride on train); W. Prosser, Handbook of the Law of Torts § 70, at 464 (4th ed. 1971).

wrongful conduct is so far removed from the beneficent purposes of the charity that it would serve no salutary societal goal to accord immunity from liability. The immunity protects the charity in its normal endeavors, and not in activities that are antithetical to its charitable ends." *Post* at 549. It is ironic that in the dissent's view the more remote the agent's act is from the charity's purposes, the more liable the charity will become. This is contrary to common law doctrine.

We understand the desire to find an exception to immunity here. At the time of *Collopy*, courts naturally sought exceptions to the doctrine of charitable immunity. It was in disfavor as a matter of public policy. In *Lindroth v. Christ Hosp.*, 21 *N.J.* 588, 590–91 (1956), Justice Brennan wrote:

> The protection of charitable organizations from liability in damages for otherwise just claims arising from their negligence is losing support throughout the country. In the recently published second edition of his handbook on the law of torts Dean Prosser comments that the law conferring this immunity "is undergoing rapid change," largely influenced by the 1942 decision of the late Mr. Justice Rutledge in *President and Directors of Georgetown College v. Hughes*, 76 *U.S.App.D.C.* 123, 130 *F.2d* 810 (*App.D.C.* 1942), written while the Justice was a judge of the Court of Appeals of the District of Columbia. That "devastating opinion," says Dean Prosser, "reviewed all of the arguments in favor of the immunity and demolished them so completely as to change the course of the law," and was followed by "a flood of recent decisions holding that a charity is liable for its torts to the same extent as any other defendant." The Dean lists 17 jurisdictions in addition to the District of Columbia where the immunity was formerly recognized and has now been repudiated. He concludes, "The immunity of charities is clearly in full retreat." *Prosser, Law of Torts* (*2d ed.* 1955), *pp.* 787, 789.

This retreat culminated in the *Collopy* trilogy abolishing the doctrine. Yet, even in rejecting the "historical error and the lack of current utility or justification for the immunity," Justice Jacobs recognized that "[t]here is no doubt that within constitutional limits the Legislature may at any time, if it so chooses, explicitly fix the State's policy as to the immunity of charitable institutions from tort responsibilities." *Collopy*, 27 *N.J.* at 33, 41.

Within a week, the Legislature acted to restore the doctrine by introduction of an act to provide immunity for all nonprofit

corporations organized for religious, charitable, educational, or hospital purposes from negligence suits brought by any person who was a beneficiary, to whatever degree, of the organization's works. *L.* 1958, *c.* 131. That law, enacted on July 22, 1958, was scheduled to expire June 30, 1959.

On June 11, 1959, a successor statute, *N.J.S.A.* 2A:53A–7 to –11, was enacted. The law was identical to the predecessor but had no expiration date. It remains the law today. The Legislature thus quickly reversed the retreat of the doctrine in New Jersey.

*N.J.S.A.* 2A:53A–10 provides:

This act shall be deemed to be remedial and shall be liberally construed so as to afford immunity to the said corporations, societies and associations from liability as provided herein in furtherance of the public policy for the protection of nonprofit corporations, societies and associations organized for religious, charitable, educational or hospital purposes.

■ Whatever this Court's views of immunity, *cf. Foldi v. Jeffries*, 93 *N.J.* 533 (1983) (limits on parental immunity); *Merenoff v. Merenoff*, 76 *N.J.* 535 (1978) (no interspousal immunity for personal injury actions); *France v. A.P.A. Trans. Corp.*, 56 *N.J.* 500 (1970) (no parental immunity for automobile negligence actions); *Immer v. Risko*, 56 *N.J.* 482 (1970) (no interspousal immunity for automobile negligence actions), we should apply this statute as the Legislature intended.

The focus of the legislative process was not on the question of what exceptions were consistent with the historical development of the doctrine of common law charitable immunity. The focus was on the economic effect of abolition of the doctrine upon the charities. *Hearings on S. 204 re Exemption of Religious, Charitable and Hospital Organizations from Negligence Liability, Before the Assembly Judiciary Committee,* (July 17, 1958).

We need not, then, theorize about whether liability for negligent hiring or administrative negligence advances the purposes of charitable immunity as it developed at common law, since the Legislature has "explicitly fix[ed] the State's policy." *Collopy,* 27 *N.J.* at 41. That policy is that the act shall be deemed to be

"remedial and shall be liberally construed so as to afford immunity * * * for the protection of nonprofit corporations * * * organized for religious, charitable, educational or hospital purposes." *N.J.S.A.* 2A:53A–10. Nowhere does the dissent recognize this statutory mandate or seek to give it effect.

Taken in that light, we believe that the Legislature intended to deal with the reality that corporate charities can act only through employees, whether at the management or field level. Finally, we do not discern in the lack of parallelism between clauses of the statute dealing with strangers and beneficiaries an intention that a charitable organization be liable for its negligence in hiring. *N.J.S.A.* 2A:53A–7 immunizes a charity for "damages to any [beneficiary] who shall suffer damage from the negligence *of any agent or servant* of such corporation," whereas an "unconcerned" person "who shall suffer damage from the negligence *of such corporation * * * or of its agents or servants*" may recover. (Emphasis supplied. But a corporation can act only through its agents or servants. *Cf. Roosen v. Peter Bent Brigham Hosp.*, 235 *Mass.* 66, 126 *N.E.* 392 (1920) (no charitable immunity distinction between administrators' and agents' negligence). Nothing in the legislative history points to so subtle a distinction as adverted to in *Roosen*. As noted, the interim immunity statute, *L.* 1958, *c.* 131, was introduced within seven days of the *Collopy* decision, and on June 16, 1958, the Assembly Committee inserted the specific language because the Senate bill did not distinguish between strangers and beneficiaries. The permanent statute follows the interim statute without change to that provision and nothing in its history sustains a legislative determination to distinguish administrative negligence.

■ We agree that a statute should be construed in light of probable legislative intent in the context of an evolving common law. *Cf. Renz v. Penn Central R.R. Co.*, 87 *N.J.* 437, 443 (1981) (railroad immunity modified by comparative negligence). We see no evolution of common law doctrine that conflicts with the

original legislative policy insofar as ordinary negligence of a charity's employees is involved. Courts have questioned whether the statute applies in cases of strict liability. *See Brody v. Overlook Hosp.,* 121 *N.J.Super.* 299 (Law Div.1972), rev'd, 127 *N.J.Super.* 331 (App.Div.1974), aff'd, 66 *N.J.* 448 (1975). Whether immunity should cloak those with a reckless or gross disregard for the safety of others is a question that may have to be addressed. *See Foldi v. Jeffries,* 93 *N.J.* 533 (1983) (parental immunity does not extend to willful or wanton failure to supervise); *Brown v. Anderson Cty. Hosp. Ass'n,* 268 *S.C.* 479, 234 *S.E.*2d 873 (1977) (no charitable immunity for hospital's heedless and reckless acts). Perhaps the time has come for the Legislature to consider again the scope of the law and its intended application to new theories of liability. *See* Bottari, *The Charitable Immunity Act,* 5 *Seton Hall Legis. J.* 61 (1980).

The arguments of the dissent, then, are not without appeal but are based upon the premise that we can modify the law to our own views of public policy rather than those set forth by the Legislature. The dissent follows exactly the same legal method that existed when charitable immunity was based solely on the common law. Throughout the nation courts have varied words and theories in order to engraft exceptions onto the charitable immunity doctrine. That was acceptable so long as the doctrine was the creature of the common law. It is no longer acceptable, for the Legislature has spoken and has directed the court to interpret the immunity liberally. *N.J.S.A.* 2A:53A–10.

Others must reconcile the issues of moral responsibility. As to legal responsibility, we find that the act charged against the charity here is negligence in hiring. Under New Jersey's Charitable Immunity Act a charity is not liable for negligence.

The judgment below is affirmed. No costs.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, O'HERN and GARIBALDI—4.

*For reversal*—Justices SCHREIBER, HANDLER and POLLOCK—3.

HANDLER, J., dissenting.

In this case a boy was sexually abused by a teacher employed by The Roman Catholic Archdiocese of Newark, a charitable institution. This horrendous experience drove the youngster to suicide. The boy's parents seek redress from the institution, which claims to be free from any legal responsibility for this tragedy because of the statutory immunity for negligence conferred upon charitable entities under *N.J.S.A.* 2A:53A–7.

The facts in this case, established by way of a motion for summary judgment, are recited adequately in the majority opinion. Christopher Schultz, an eleven-year old boy, was the victim of the sexual depredations of Robert Coakley, a teacher and camp counsellor employed by the institution. The complaint graphically portrays the personal devastation that resulted from Coakley's egregious acts.

This appeal implicates several issues. A threshold question to be settled is whether the institution, without regard to its status as a charitable entity, can be held legally responsible for the intentional wrongs committed by its employees against innocent third persons. The next and major issue is whether the statutory immunity accorded charitable entities constitutes an affirmative defense to that cause of action.

I

The initial issue posed on this appeal was recently considered by this Court in a case that, coincidentally, involved a charitable entity that operated a boy scout camp. We acknowledged the rule "that an employer who negligently hires or retains in his employ an individual who is incompetent or unfit for the job may be liable to a third party whose injury was proximately caused by the employer's negligence." *DiCosala v. Kay,* 91 *N.J.* 159, 174 (1982). We held that "one may be legally responsible for injuries to third persons caused by the negligent hiring or retention of an incompetent, unfit or dangerous employee." *Id.* That case, as this one, involved a child who suffered injuries as a

result of the tortious conduct of an employee. In assessing the reasonableness of the employer's conduct with respect to the hiring, retention or supervision of an employee with dangerous propensities, we emphasized that "a higher degree of care is often required to be exercised" where young children may be victimized by the particular employee. *Id.* at 180. The heightened duty of care owed children, we said, "is especially important in case the use of the premises involved the presence of children and the employee's employment entailed direct contact with children." *Id.*

There can be no question that a fair reading of the complaint in this case projects a tenable cause of action against the institution. The complaint presents the theory that the institution was negligent in the hiring, supervision and retention of Coakley, who had abnormal and dangerous sexual proclivities. It was reasonably foreseeable that the employment of such a person with knowledge of his dangerous propensities created an unreasonable risk of harm to innocent youngsters. Such a cause of action falls within the ambit of our holding in *DiCosala v. Kay.*

## II

The pivotal question then is whether an entity, otherwise liable for injuries suffered by an innocent third person resulting from the intentional wrongdoing of its employee on grounds of negligence in the hiring, supervision or retention of the employee can, because of its status as a charitable institution, interpose an absolute defense under the charitable immunity statute.

The charitable immunity statute, first enacted in July 1958, *L. 1958, c.* 90, and later reenacted as *L.* 1959, *c.* 131, was passed in response to the judicial abrogation of common law charitable immunity. This occurred in a series of cases decided by this Court on April 28, 1958: *Dalton v. St. Luke's Catholic Church,* 27 *N.J.* 22; *Collopy v. Newark Eye & Ear Infirmary,* 27 *N.J.* 29; and *Benton v. Y.M.C.A.,* 27 *N.J.* 67. In each of these cases, we

ruled that in an action for ordinary negligence committed by an employee of the charitable entity and brought by a person injured as a result of such negligence, a cause of action would be recognized and liability against the entity allowed.

The immunity statute was passed to countermand this judicial action and to reinstate the common law immunity. It states:

> No nonprofit corporation, society or association organized exclusively for religious, charitable, educational or hospital purposes shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the *negligence* of any agent or servant of such corporation, society or association, where such person is a beneficiary of the association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the *negligence* of such corporation, society, or association or of its agents or servants where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association; but nothing herein contained shall be deemed to exempt the said agent or servant individually from their liability for any such *negligence*. [*N.J. S.A.* 2A:53A–7 (emphasis added).]

We are required in the first instance to construe a statute according to the ordinary meaning that can be ascribed to its evident wording and plain language. *Levin v. Township of Parsippany-Troy Hills,* 82 *N.J.* 174, 182 (1980). Where a clear and obvious meaning is revealed by statutory language, given its usual significance and common understanding, that meaning must be accepted as the one intended by the enactment. *Watt v. Mayor and Council of Borough of Franklin,* 21 *N.J.* 274, 276 (1956). The interpretation of immunity statutes does not call for a different approach. *Renz v. Penn Central R.R. Co.,* 87 *N.J.* 437, 440 (1981); *Harrison v. Middlesex Water Co.,* 80 *N.J.* 391 (1980).

An unstrained reading of the statutory language conveys the clear meaning that the wrongful conduct that is the focus of the statute consists of "negligence." There is not the slightest linguistic hint that the "negligence," which is reiterated in the statute, denotes anything other than ordinary negligence. *N.J. S.A.* 2A:53A–7 does not mention other forms of aggravated wrongful conduct, such as malice or fraud, or intentional, reckless and wanton, or even grossly negligent behavior. The stat-

ute by its evident terms does not address liability, or immunity from liability, for the commission of any torts other than simple negligence.

Furthermore, there is no reason to believe that this statutory meaning does not fully comport with the intent of the Legislature in enacting the statutory immunity. As noted, the legislative purpose was to overcome the judicial decisions that had abrogated the common law immunity. The statute was designed simply to reimplant the common law doctrine. *See Merenoff v. Merenoff,* 76 *N.J.* 535 (1978).

The decisions in this jurisdiction that expounded the common law immunity for charitable entities afforded such relief for common or ordinary negligence. *E.g., Lindroth v. Christ Hosp.,* 21 *N.J.* 588 (1956); *Kolb v. Monmouth Memorial Hosp.,* 116 *N.J.L.* 118 (E. & A. 1936); *Simmons v. Wiley-Methodist Episcopal Church,* 112 *N.J.L.* 129 (E. & A. 1934); *Boeckel v. Orange Memorial Hosp.,* 108 *N.J.L.* 453 (Sup.Ct.1932), aff'd, 110 *N.J.L.* 509 (E. & A. 1933); *D'Amato v. Orange Memorial Hosp.,* 101 *N.J.L.* 61 (E. & A. 1925). Because the statute itself was intended to restore only that immunity that the Court itself had eliminated, and that immunity applied essentially to simple negligence, it is readily inferable that the Legislature did not intend to provide by statute an immunity covering aggravated forms of wrongful conduct. This implied legislative purpose is confirmed by the explicit statutory language selected by the Legislature.

It has been argued, however, that the immunity statute can be read to create an ambiguity as to its meaning. The initial provision of *N.J.S.A.* 2A:53A-7 refers to claims for damages attributable to "the negligence of any agent or servant of such [charitable] corporation, society or association." The succeeding provision uses the phrase "negligence of such corporation, society or association or its agents or servants." It is suggested that this latter section recognizes a difference between the negligence of agents and servants and the negligence of the entity

itself. The negligence of the entity, it is contended, can consist of administrative negligence, which can take the form of the negligent hiring or supervision of a dangerous employee who foreseeably commits an intentional tort.

That reading of the respective statutory provisions misconceives what constitutes the major distinction between them. The purpose of the second section was not to add another species of wrongful conduct that would qualify for the immunity, namely, entity or managerial negligence as opposed to employee-servant negligence. Rather, the sole point of difference relates to the *status* of the claimant. By the clear terms of the first section of *N.J.S.A.* 2A:53A–7, the immunity obtains when the victim stands in the special legal relationship of *beneficiary* of the charity. The second provision states the converse: the immunity does not apply when the victim is not a beneficiary— is "one unconcerned in and unrelated to and outside of the benefactions of such corporation, society and association." This distinction—between victims who are beneficiaries and those who are not—is the critical factor as to when the immunity is available to the charity. It is, I suggest, the sole substantive difference between the passages.[1]

---

[1]To read the second passage as adding a distinctive class of negligence—administrative negligence—to the immunity statute makes no sense. To impute this as the meaning intended by that passage would produce this peculiar result: under the first section, a *beneficiary* of the charity could not recover against the charity for injuries directly and solely resulting from the negligence of an agent or employee of the entity. However, since the first section does not provide an immunity for administrative negligence, such a victim, even though a beneficiary, could recover—the immunity would not apply— from the charity if those same injuries were proximately caused by the administrative negligence of the charity. Turning to the second section, dealing with a *nonbenificiary* of the charity, a victim could recover whether the causative negligence is that of an agent or employee or the administrative negligence of the entity or both. Since a *beneficiary* can also recover under this reading of the first provision, a victim could always recover from the charity for administrative negligence regardless of whether he or she is a beneficiary of the charity.

Assuming, however, that such a reading of the statute is permissible, it would at most create some uncertainty as to the true legislative meaning. In that posture, we would then have to resort to extrinsic aids to determine the underlying legislative intent. *Service Armament Co. v. Hyland,* 70 *N.J.* 550 (1976). Because the Legislature intended to restore the common law doctrine of charitable immunity, a natural starting point for our inquiry is a closer examination of the common law rule. *Renz v. Penn Central R.R. Co., supra.*

We have consistently recognized that the essence of the common law is its foundations in public policy. The common law is not immutable; it moves with the currents of public policy. Common law tenets that do not keep pace with the tide of public policy are necessarily and properly left behind. Common law doctrines that "have outlived their usefulness and * * no longer serve justice or the interests of society" are rightly abandoned. *La Stella v. Garcia Estates, Inc.,* 66 *N.J.* 297, 305 (1975). The movement of the common law is especially free when its course is not otherwise obstructed by intervening acts of legislation. *See Willis v. Department of Conservation & Economic Dev.,* 55 *N.J.* 534 (1970); *France v. A.P.A. Transport Corp.,* 56 *N.J.* 500 (1970); *Immer v. Risko,* 56 *N.J.* 482 (1970); *Henningson v. Bloomfield Motors, Inc.,* 32 *N.J.* 358 (1960); *Smith v. Brennan,* 31 *N.J.* 353 (1960); *Collopy v. Newark Eye and Ear Infirmary, supra; State v. Culver,* 23 *N.J.* 495, 506 (1957), *cert.* den., 354 *U.S.* 925, 77 *S.Ct.* 1387, 1 *L.Ed.2d* 1441

---

It may be further noted that the same phraseology, "negligence of such corporation, society or association or of its agent or servants" found in the second provision of *N.J.S.A.* 2A:53A–7, is repeated in *N.J.S.A.* 2A:53A–8. This is simply a general reference to "negligence." The latter section provides a limited recovery in the amount of $10,000 to a *beneficiary,* underscoring the premise that the critical factor in the application of the immunity is the status of the injured party as a *beneficiary* and not the distinction between direct and administrative negligence. This internal sense of the statute must govern our construction of its terms, especially when to construe otherwise brings us to anomalous results. *E.g., Marranca v. Harbo,* 41 *N.J.* 569 (1964).

(1958). Legislative enactments, however, do not always dam the channel of the decisional law. They may serve as conduits for the continuing flow of public policy traditionally encompassed by the common law. *See Renz v. Penn Central R.R. Co., supra; Merenoff v. Merenoff, supra.*

In *Collopy, supra,* one of the trilogy of cases in which this Court abolished the common law rule of charitable immunity, the Court reviewed the primary justification for the rule. It concluded that prevailing perceptions of public policy were the primary basis for the doctrine. 27 *N.J.* at 38–39. Because the statute codifies the common law, the concepts of public policy that generated the common law rule, including their inherent capacity to change over time, were presumably imported by the Legislature into the immunity statute. *See Immer v. Risko, supra.* In fact, the Legislature expressly recognized "public policy" as the generating force behind the statutory immunity. It explicitly directed that the enactment was to be construed liberally "in furtherance of the public policy" that justified the protection of beneficent nonprofit entities. *N.J.S.A.* 2A:53A–10.

The earliest English decisions that established the charitable immunity doctrine did not stress general notions of prevailing public policy as the underlying reason for the rule. These cases viewed a charitable entity as the manager of a trust that should be immune from liability to third persons because the award of damages would constitute an unwarranted invasion of the trust fund and its diversion to an unintended purpose. *E.g., Duncan v. Findlater,* 7 *Eng.Rep.* 934 (H.L.1839); *The Feofees of Heriot's Hosp. v. Ross,* 8 *Eng.Rep.* 1508 (H.L.1846); *Holliday v. Vestry of the Parish of St. Leonard, Shoreditch,* 103 C.B. 192 (N.S.1861). However, in 1865, in the case of *Mersey Docks & Harbour Bd. v. Gibbs,* 11 *Eng.Rep.* 1500 (H.L.C.1864–66), the rationale of *Duncan, Heriot's Hosp.* and *Holliday* was specifically repudiated. The court declared that a public corporation whose funds were held in trust was liable for the negligence of its servants in causing injury to third persons in the same way as any private corporation would be liable. Subsequently this rule of accounta-

bility was carried over to charitable organizations in *Hillyer v. The Governors of St. Bartholomew's Hosp.,* 2 *K.B.* 800 (1909).

*McDonald v. Massachusetts General Hosp.,* 120 *Mass.* 432 (1876), the first American case to hold that a charitable institution is not liable for the tortious acts of its agents or employees, was rendered five years after the English courts had disavowed the doctrine. The court, relying on the decision in the *Holliday* case, and apparently unaware that its rationale had been discarded, held that a non-profit organization operated for public charitable purposes could not be required to respond in damages for negligence. *McDonald* was followed by a Maryland decision, *Perry v. House of Refuge,* 63 *Md.* 20, 22 (1889) which rejected liability even for an intentional tort committed by an employee of an entity created for "benevolent purposes." The court relied exclusively upon the trust fund theory and applied the rule formerly announced in *Heriot's Hospital, supra,* in support of its conclusion that "damages cannot be recovered from a fund held in trust for charitable purposes". *Perry v. House of Refuge, supra,* 63 *Md.* at 22.

As noted by Justice Jacobs in *Collopy,* the early pre-Act New Jersey decisions did not fully subscribe to the trust fund theory, but spoke primarily in terms of public policy. *E.g., D'Amato v. Orange Memorial Hospital, supra,* 101 *N.J.L.* at 65; *Boeckel v. Orange Memorial Hospital, supra,* 108 *N.J.L.* at 455; *Kolb v. Monmouth Memorial Hospital, supra,* 116 *N.J.L.* at 119–20; *Bianchi v. South Park Presbyterian Church,* 123 *N.J.L.* 325, 327 (E. & A.1939). *D'Amato* relied in some measure upon the New York cases that had recognized the common law charitable immunity doctrine, citing *Schloendorff v. The Society of New York Hospital,* 211 *N.Y.* 125, 105 *N.E.* 92 (1914), a leading decision. Judge Cardozo, in a later case, *Hamburger v. Cornell Univ.,* 240 *N.Y.* 328, 148 *N.E.* 539, 543 (1925), stressed that the appropriate basis for the common law doctrine was public policy, observing that "[i]n this state * * * the trust fund theory has been rejected." 240 *N.Y.* at 331, 148 *N.E.* 539. Thus, *D'Amato,* which was the first authoritative pronouncement of the charita-

ble immunity doctrine in this state, adopted the New York conceptualization of the immunity with its rejection of the trust fund theory and its reliance upon public policy. As previously noted, the New Jersey Legislature itself has recognized public policy to be the proper foundation of its statutory grant of immunity. *N.J.S.A.* 2A:53A–10.

A public policy that suffers an immunity for tortious acts, thereby tolerating an exception to the overriding principle that injuries from wrongful conduct be redressed, must surely be hostile to a legal sanctuary for aggravated wrongs. *E.g., Foldi v. Jeffries,* 93 *N.J.* 533 (1983). Even more so must a sound public policy, reflecting the conscience of the community, be loathe to carve out a legal haven for willful and intentional misconduct. *E.g., Tevis v. Tevis,* 79 *N.J.* 422 (1979); *Small v. Rockfeld,* 66 *N.J.* 231 (1974).

The Supreme Court of South Carolina refused to extend the common law charitable immunity to a hospital for the intentional act of false imprisonment committed by its employees. *Jeffcoat v. Caine,* 261 *S.C.* 75, 77, 198 *S.E.*2d 258, 260 (1973). The court stated that:

> [w]hile there can be no doubt that [our] decisions contain broad general expressions to the effect that charitable institutions are exempt from all tort liability, the rule has never been extended beyond exemption from liability for mere negligence. Therefore, the application of the immunity doctrine in a case of intentional tort is not required by precedent, nor, we conclude, by reason or justice. [*Id.*]

*See also Douglass v. Florence General Hosp.,* 273 *S.C.* 716, 718, 259 *S.E.*2d 117, 119 (1977) (patient's cause of action against hospital, alleging assault and battery arising from performance of injection without informed consent, stated cause of action based on intentional tort, for which hospital was not immune); *Brown v. Anderson Cty. Hosp. Ass'n,* 268 *S.C.* 479, 234 *S.E.*2d 873 (1977) (charitable hospitals are liable for their heedless and reckless torts); *Peden v. Furman Univ.,* 155 *S.C.* 1, 151 *S.E.* 907 (1930) (immunity doctrine does not exempt charity from liability for trespass arising out of activity of lessee).

Similarly, in *Maniaci v. Marquette Univ.*, 50 *Wis.* 287, 184 *N.W.*2d 168 (1971), plaintiff, a student, brought an action to recover for false imprisonment against defendant, an eleemosynary institution. The Supreme Court of Wisconsin noted in dictum:

> We should point out that defendant's assertion that Marquette University * * is not liable for the intentional torts of its agents finds no support in the Wisconsin law. Under Wisconsin law, the general rule is subject to the usual rules of agency, that an employer is vicariously liable for the torts of his employees. While * * * this court [has] created an exception and laid down the rule * * * that a charity is exempt from liability for the negligent torts of its employees, defendants have failed to point out any rule of this jurisdiction or any other where an exception has ever been created to relieve charitable institutions of *the intentional torts* of their servants under circumstances where the principal would otherwise sustain vicarious liability. No policy reasons are urged by defendants and none occur to us * * *. [*Id.* at 296, 184 *N.W.*2d 168 (emphasis added).]

In understanding the dimensions of our own statutory immunity, we must resort to the public policy foundations that sustain the charitable immunity doctrine as imported into our statutory law. To disregard that public policy is to disrespect the legislative scheme. I am satisfied that the public policy rationale recognized by this state's persuasive decisional authority in the evolution of the common law charitable immunity doctrine is fully applicable to the charitable immunity statute. It is evident that in the commission of an intentional tort, the wrongful conduct is so far removed from the beneficent purposes of the charity that it would serve no salutary societal goal to accord immunity from liability. The immunity protects the charity in its normal endeavors, and not in activities that are antithetical to its charitable ends.

This conclusion—that public policy dictates the exclusion of intentional torts from the charitable immunity coverage of the statute—is strongly supported by other considerations. Under the statute and the common law, the charitable institution is not immune from tort liability where the circumstances giving rise to liability are unrelated to the beneficent objectives for which the charity is organized.

Generally, this result—the loss of immunity—occurs in two ways. One is when the claimant is a stranger to the charity, that is, is not a beneficiary of its charitable works. Our common law recognized that only when the plaintiff is a beneficiary, a recipient of the works of the charity, can immunity be conferred. *E.g., Daniels v. Rahway Hosp.*, 10 *N.J.Misc.* 585 (Com. Pleas 1932). The court in *Simmons v. Wiley-Methodist Episcopal Church, supra,* emphasized public policy considerations in reaching its conclusion that no kind of organization should be permitted with impunity to commit wrongs against those in no way participating in the institution's benevolence. *See also Lindroth v. Christ Hosp., supra; Bianchi v. South Park Presbyterian Church, supra; Kolb v. Monmouth Memorial Hosp., supra; Rose v. Raleigh Fitkin-Paul Morgan Foundation,* 136 *N.J.L.* 553 (E. & A.1948).

This condition for immunity is carried forward in the statute. *N.J.S.A.* 2A:53A–7 provides that "such immunity from liability shall not extend * * * where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association * * *." The statutory immunity is a mirror reflection of the common law doctrine, and decisions under the statute are consistent with their common law progenitors. *E.g., Bixenman v. Christ Episcopal Church Parish House,* 166 *N.J.Super.* 148 (App.Div.1979); *see also Stoolman v. Camden County Council Boy Scouts,* 77 *N.J.Super.* 129 (Law Div.1962); *Anasiewicz v. Sacred Heart Church,* 74 *N.J.Super.* 532 (App.Div. 1962).

In addition to the requirement that the victim be a beneficiary of the charity, the immunity can be lost if the activities of the charity giving rise to the claim of liability are not clearly in furtherance of its charitable purposes. If they are not, even the status of an injured party as a beneficiary will not defeat liability. *E.g., Kasten v. Y.M.C.A.,* 173 *N.J.Super.* 1 (App.Div. 1980); *Pomeroy v. Little League Baseball of Collingswood,* 142 *N.J.Super.* 471 (App.Div.1976); *Sommers v. Union Beach First Aid Squad,* 139 *N.J.Super.* 425 (App.Div.1976); *Book v. Aguth*

*Achim Anchai of Freehold, N.J.,* 101 *N.J.Super.* 559 (App.Div. 1968).

These dual requirements of the charitable immunity, both at common law and under the statute, serve to make the immunity conditional rather than automatic. Immunity does not attach simply because the entity is a charity. Rather, its availability is determined by whether the entity is acting charitably when the tortious conduct occurs. The critical conduct must be inspired by and directed to a charitable end. This is central to the charitable immunity doctrine. The conduct of the charity, both in terms of the relationship between the charity and the claimant and in terms of its beneficent works, must in all respects be directly and clearly related to the furtherance of the legitimate purposes of the charity. *See* Bottari, "The Charitable Immunity Act," 5 *Seton Hall Legis.J.* 61 (1980) (most cases tend to focus on two areas: the distinction between beneficiary and stranger and an assessment of the alleged "religious, charitable or hospital purposes" of the association).[2]

In this case, the most crucial fact is that the tortious acts giving rise to the grievous wrongs suffered by plaintiffs involved intentional and willful conduct by the employee. The employee's injurious acts served only his own malicious and salacious ends; they were totally disconnected from his lawful

---

[2]In this context, the majority observes that "[i]t is ironic that in the dissent's view the more remote the agent's act is from the charity's purposes, the more liable the charity will become." *Ante* at 536. This criticism fails to appreciate the fact that "remoteness" between the charitable institution and the aggrieved plaintiff—in the sense that the critical conduct is removed from the charity's beneficent objects or that the plaintiff is a stranger to the charity—is the very basis upon which both the common law and the statute would recognize liability. The conditional nature of the immunity, limited to those contexts in which the charity is both engaged in a proper pursuit of its charitable endeavors and stands in a beneficent relationship to plaintiff, is itself a reflection of this principle. This premise, however, does not permit liability where the primary tortious conduct is so "remote" and attenuated in terms of resultant injuries as to obviate proximate cause. Proximate cause, of course, remains a fundamental requirement for liability. *See DiCosala v. Kay, supra,* 91 *N.J.* at 174.

employment and the legitimate work of the charity. The predicates for charitable immunity do not exist in this case. The sexual exploitation of an innocent child by a perverted employee destroys any vestige of a beneficent nexus between the charity and its victim. In this tragic and evil setting, it is a misnomer to characterize the child as a beneficiary of the institution. Further, the heinous character of the conduct totally negates any possibility of achieving a charitable end.

I am convinced that the strong policy reasons that withhold immunity to a charitable entity from liability for wrongful conduct not related to the charity's legitimate purpose or with respect to a victim who does not otherwise benefit from the works of the charity apply fully to liability based upon the intentional wrongdoing of an employee committed for his own personal and insidious reasons. I conclude therefor that the statutory charitable immunity does not apply to such aggravated torts.

### III

The second reason that persuades me to recognize a cause of action in this case is based upon an exception in the charitable immunity statute where the asserted negligence involves negligent hiring, supervision or retention of a dangerous or incompetent employee by the institution itself. The public policy that supports the conclusion that the immunity statute has no application to the victim of an intentional tort committed by a dangerous employee of a charity supports as well the exception to the immunity based on negligent hiring.

In *McDonald v. Massachusetts General Hosp.*, supra, the Massachusetts Supreme Court held that a charity could not be required to respond in damages for negligence unless it could be shown that the institution had been negligent in the selection of the employee who caused the injury. The court engaged in a substantial discourse as to the character of this duty to use care in the selection of employees:

If, however, any contract can be inferred from the relation of the parties, it can be only on the part of the corporation that it *shall use due and reasonable care in the selection of its agents.* Where actions have been brought against commissioners of public works serving gratuitously, for negligence in carrying on the work, by which injury has occurred, it has been held that they were not liable *if proper care had been used by them in selecting those who were actually to perform the work. Holliday v. St. Leonard's,* 11 C.B. (N.S.) 192. The liability of the defendant corporation can extend no further than this; if there has been no neglect on the part of those who administer the trust and control its management, *and if due care has been used by them in the selection of their inferior agents,* even if injury has occurred by the negligence of such agents, it cannot be made responsible. (Emphasis supplied.) [120 *Mass.* at 435 (emphasis added).]

In *D'Amato v. Orange Memorial Hosp., supra,* the Court relied upon *McDonald,* "where it was held that a corporation established for the maintenance of a public charitable hospital, which has exercised due care in the selection of its agents, is not liable for injury to a patient caused by their negligence." 101 *N.J.L.* at 65. While the Court also noted the subsequent retreat from this position by the Massachusetts court, exemplified in *Roosen v. Peter Bent Brigham Hosp.,* 235 *Mass.* 66, 126 *N.E.* 392 (1920), it did not "go so far as to hold that a charitable corporation maintaining a hospital might not be liable to a patient if carelessness were shown in the selection of the agent responsible for the injury, as that question is not raised in this case." *Id.* [3]

Our courts have focused primarily upon reasons of public policy in determining the extent of liability of a charitable institution. *Ante* at 538. An enlightened public policy requires that a charitable institution use due care in the selection of its employees. *See Hamburger v. Cornell Univ., supra.* As a matter of sound public policy, the immunity from ordinary negligence should attach only if the charitable entity

---

[3]One legal commentator has observed that "the implication [from *D'Amato*] is that negligence [in the selection of servants] would probably afford a basis of recovery even to a [beneficiary]." Appleman, "The Tort Liability of Charitable Institutions," 22 *A.B.A.J.* 48, 53, n. 52 (1936).

has exercised due care in the selection and supervision of its employees.

The strongest countervailing position is simply that our courts had not definitively resolved the question of whether negligent hiring is an exception to the immunity doctrine. *D'Amato v. Orange Memorial Hosp., supra,* 101 *N.J.L.* at 65 ("the question [of negligent hiring] is not raised in this case"). *See also Bianchi v. South Park Presbyterian Church, supra,* 123 *N.J.L.* at 333 ("there was no evidence tending to establish the allegation [of negligent hiring], and the case does not raise the question of the liability of such a charity to one of its beneficiaries for failure to exercise reasonable care in the selection of its negligent servant, and there is therefore no occasion to consider that point").

Two trial court cases expressed different views on this subject. *Fields v. The Mountainside Hosp.,* 22 *N.J.Misc.* 72 (Cty.Ct. 1944), recognized a claim of administrative negligence and negligent hiring against a hospital corporation for failure to furnish suitable apparatus and to select and employ competent employees whose duty it was to inspect, repair and maintain the equipment. An opposite result was reached in *Fair v. Atlantic City Hosp.,* 25 *N.J.Misc.* 65 (Cty.Cir.Ct.1946). *Woods v. Overlook Hosp. Ass'n,* 6 *N.J.Super.* 47 (App.Div.1947), citing *Fair,* similarly refused to recognize an exception for the alleged administrative negligence of the defendant. The court, however, did not reject the contention that an exception should be recognized where the injury results from the charitable institution's failure to use reasonable care in the selection of its employees, noting only that there was no evidence in support of the claim.[4] *Jones v. St. Mary's Roman Catholic Church,* 7 *N.J.* 533, cert. den. 342

---

[4] It is of interest to note that the court separately disposed of the administrative negligence and negligent hiring claims. Plaintiffs separately pleaded each, and the court treated the two as severable and distinct proposed exceptions, with *Fair* as precedent for the former and *Bianchi* as precedent for the latter. There is support in the literature and case law for according

*U.S.* 886, 72 *S.Ct.* 175, 96 *L.Ed.* 664 (1951), is the last judicial pronouncement by this Court on the subject area prior to abolition of the doctrine in 1958. There we noted in dictum that the immunity extends to acts of "administrative negligence." *Id.* 7 *N.J.* at 538. We had no occasion, however, to deal with the specific tort of "negligent hiring" with respect to the wrongful conduct of an employee acting beyond the scope of his employment and beyond the reach of the *respondeat superior* doctrine.[5]

Even though an exception for negligent hiring arguably had not been resolved in this jurisdiction at the time the common law charitable immunity was codified by its statutory enactment, as already noted the common law precepts of public policy were incorporated as the foundation of the statutory immunity. A great many jurisdictions recognized negligent hiring as an exception to the common law immunity afforded charitable entities.[6] The earliest American decision espousing the immunity, *McDonald v. Massachusetts General Hosp., supra,* refused to

---

separate treatment to administrative negligence and negligent hiring. *See, e.g., Miller v. Sisters of St. Francis,* 5 *Wash.*2d 204, 105 *P.*2d 32 (1940).

[5]In *Jones, supra,* plaintiff, a student, was injured by a fellow student while both were in attendance at a parochial school operated by defendant. Plaintiff brought a negligence action against defendant, alleging that his injuries were proximately caused by the carelessness of one of defendant's instructors. The Court denied recovery, relying on the fact that plaintiff was a "beneficiary" of defendant charitable institution at the time the injuries occurred. It is clear that liability was asserted on the theory of *respondeat superior,* based on the employee's negligence within the scope of his employment, for which the school could claim the statutory immunity. Thus, the Court had no occasion to apply any exception attributable to "administrative negligence." In this case, however, the question, not presented in *Jones,* is whether immunity can attach for such "administrative negligence" or "negligent hiring" where the employer-institution would not otherwise be legally responsible for the acts of its employee on the basis of *respondeat superior.*

[6]These include California, *see, e.g., Ritchie v. Long Beach Hosp. Ass'n,* 139 *Ca.* 688, 34 *P.*2d 771 (1934); Connecticut, *see, e.g., Cashman v. Meridian Hosp.,* 117 *Conn.* 585, 169 *A.* 915 (1933); Indiana, *see, e.g., Winona Technical Inst. v. Stolte,* 173 *Ind.* 39, 89 *N.E.* 393 (1903); Montana, *see, e.g., Borgess v. Oregon Shortline R. Co.,* 73 *Mont.* 407, 236 *P.* 1069 (1925); North Carolina,

extend it to liability based upon negligence in hiring. This decision was a powerful influence in the development of our own conceptualization of the doctrine. *E.g., D'Amato v. Orange Memorial Hosp., supra.*

If history and precedent do not clearly supply the answer to whether there was an exception for negligent hiring at common law, then the answer must be found through the conscientious application of reasons grounded in public policy as presently perceived. *See, e.g., Renz v. Penn Central Corp., supra; Immer v. Risko, supra; State v. Culver, supra.* Recognition of an exception based on negligent hiring comports with sound public policy and is consistent with the conditional nature of the immunity.

The immunity has always been restricted to a context in which the charity is both engaged in a proper pursuit of its charitable ends and stands in a beneficent relationship to the injured claimant. A charity failing in either forfeits the immunity. And, a charity that fails to exercise due care in the hiring or supervision of its work force generates a probability of injury to innocent third persons. Such negligence clearly undermines the essential capacity of the charity to do charity and to benefit its intended recipients. Managerial negligence of this sort defeats the essential purpose of the legal protection accorded beneficent entities. Such negligence on the part of a charity properly stands as an exception to the immunity conferred by statute.

## IV

There can be no dispute that an entity can be liable if it were negligent in its hiring, supervision or retention of a dangerous

---

see, e.g., *Hoke v. Glenn,* 167 *N.C.* 594, 83 *S.E.* 807 (1914); Ohio, *see, e.g., Taylor v. Flower Deaconess Home & Hosp.,* 104 *Ohio* 61, 135 *N.E.* 287 (1922); Oklahoma, *see, e.g., Carver Chiropractic College v. Armstrong,* 103 *Okl.* 123, 229 *P.* 641 (1924); Texas, *see, e.g., Barnes v. Providence Sanatarium,* 229 *S.W.* 588 (Tex.Civ.App., 1921) and Virginia, *see, e.g., Weston's Adminix. v. Hospital of St. Vincent of Paul,* 131 *Va.* 587, 107 *S.E.* 785 (1921).

employee. That can occur when such an employee is engaged with knowledge of his harmful propensities, creating a foreseeable risk that he will injure innocent third persons. The complaint in this case, fairly read, presents such a cause of action.

The defense of immunity to such a cause of action attributable to the status of the employing entity as a charitable institution under *N.J.S.A.* 2A:53A–7 is not available to the institution under the circumstances of this case. The foundations of the doctrine of charitable immunity as codified by the statute are reasons rooted in public policy. These reasons support the conclusion that the statutory charitable immunity does not apply to intentional torts. These reasons similarly impel the conclusion that negligent hiring, supervision and retention of potentially harmful employees by the entity constitutes an exception to the rule of charitable immunity.

Accordingly, I would reverse the judgment below.

Justices SCHREIBER and POLLOCK join in this opinion.