OPINION OF THE COURT
Simons, J.
Plaintiffs, Richard E. and Margaret Schultz, instituted this action to recover damages for personal injuries they and their sons, Richard and Christopher, suffered because the boys were sexually abused by defendant Edmund Coakeley and for damages sustained as a result of Christopher’s wrongful death after he committed suicide. Coakeley, a brother in the Franciscan order, was the boys’ school teacher and leader of their scout troop. Plaintiffs allege that the sexual abuse occurred while Coakeley was acting in those capacities and the causes of action before us on this appeal charge defendants Boy Scouts of America, Inc., and the Brothers of the Poor of St. Francis, Inc. (sued as Franciscan Brothers of the Poor, Inc.), with negligently hiring and supervising him.
 Plaintiffs are domiciled in New Jersey and some of the injuries were sustained there. Thus, a choice-of-law issue is presented because New Jersey recognizes the doctrine of charitable immunity and New York does not. Defendants contend New Jersey law governs this litigation and that its courts have already determined that plaintiffs’ claims are barred in a separate action against the Roman Catholic Archdiocese of Newark (see, Schultz v Roman Catholic Archdiocese, 95 NJ 530, 472 A2d 531). Following the rationale of Babcock v Jackson (12 NY2d 473) and similar cases, we hold that New Jersey law applies and that plaintiffs are precluded from relitigating its effect on the claims they assert.
I
In 1978 plaintiffs were residents of Emerson, New Jersey, where their two sons, Richard, age 13, and Christopher, age 11, *193 attended Assumption School, ah institution owned and operated by the Roman Catholic Archdiocese of Newark. By an agreement with the Archdiocese, defendant Brothers of the Poor of St. Francis, Inc., supplied teachers for the school. One of those assigned was Brother Edmund Coakeley, who also served as the scoutmaster of Boy Scout Troop 337, a locally chartered Boy Scout troop sponsored and approved by defendant Boy Scouts of America. Richard and Christopher attended Coakeley’s class and were members of his scout troop.
In July 1978 Coakeley took Christopher Schultz to Pine Creek Reservation, a Boy Scout camp located in upstate New York near the Oneida County community of Foresport. The camp was located on land owned by Peter Grandy, who was also a resident of Emerson, New Jersey.[1] The complaint alleges that while at the camp, Coakeley sexually abused Christopher, that he continued to do so when Christopher returned to Assumption School in New Jersey that fall and that he threatened Christopher with harm if he revealed what had occurred. The complaint also alleges that Coakeley sexually abused Richard Schultz and made similar threats to him during a scout trip to Pine Creek Reservation on Memorial Day weekend in 1978. Plaintiffs claim that as a result of Coakeley’s acts both boys suffered severe psychological, emotional and mental pain and suffering and that as a result of the distress Coakeley’s acts caused, Christopher Schultz committed suicide by ingesting drugs on May 29, 1979. They charge both defendants with negligence in assigning Coakeley to positions of trust where he could molest young boys and in failing to dismiss him despite actual or constructive notice that Coakeley had previously been dismissed from another Boy Scout camp for similar improper conduct.
The complaint contains four causes of action. In the first two, plaintiff Richard E. Schultz, as administrator of Christopher’s estate, seeks damages for Christopher’s wrongful death and for his psychological, emotional and physical injuries prior to death. In the third cause of action, plaintiff Richard E. Schultz, suing as father and natural guardian, seeks damages for similar personal injuries on behalf of his son Richard. In the fourth cause of action, plaintiffs seek damages for their own injuries, including destruction of their family life, expenditures for medical and psychological care and treatment, mental anguish and psychological injuries.
*194 After answering, defendants moved for summary judgment, urging that plaintiffs’ claims were barred by New Jersey’s charitable immunity statute (NJ Stat Ann § 2A:53A-7) and that plaintiffs were collaterally estopped from relitigating the application of the statute because of the prior New Jersey judgment. In opposition, plaintiffs contended that under applicable choice-of-law principles, New York should apply its law, not that of New Jersey, and, alternatively, that even if the New Jersey charitable immunity statute applies under choice-of-law rules, the New York courts should refuse to enforce it on public policy grounds. Special Term granted defendants’ motions, severing plaintiffs’ causes of action and dismissing the complaint against them on collateral estoppel grounds, implicitly finding New Jersey law applicable. A divided Appellate Division affirmed.
JL

A

The choice-of-law question presented in the action against defendant Boy Scouts of America is whether New York should apply its law in an action involving codomiciliaries of New Jersey when tortious acts were committed in New York. This is the posture of the appeal although defendant is a Federally chartered corporation created exclusively for educational and charitable purposes pursuant to an act of Congress (see, 36 USC § 21) that originally maintained its national headquarters in New Brunswick, New Jersey, but moved to Dallas, Texas, in 1979. New Jersey is considered defendant’s domicile because its national headquarters was in that State (see, Rosenbaum v Union Pac. R. R. Co., 2 How Prac [NS] 45, affd 100 NY 617; 13 NY Jur 2d, Business Relationships, § 146, at 421). Its change of domicile after the commission of the wrongs from New Jersey to Texas, which no longer recognizes the doctrine of charitable immunity (see, Howle v Camp Amon Carter, 470 SW2d 629 [Tex 1971]), provides New York with no greater interest in this action than it would have without the change. Our decision recognizing a postaccident change in domicile in Miller v Miller (22 NY2d 12) is distinguishable because in that case the defendant’s domicile was changed to New York, which was the forum and also the plaintiff’s domicile.
The question presented in the action against defendant Franciscan Brothers is what law should apply when the parties’ different domiciles have conflicting charitable immunity rules. The Franciscan order is incorporated in Ohio and it is a domiciliary of that State (see, Sease v Central Greyhound Lines, 306 NY *195 284, 286; 13 NY Jur 2d, Business Relationships, § 142, at 416-417). At the time these causes of action arose Ohio, like New Jersey, recognized charitable immunity (see, Williams v First United Church, 40 Ohio App 2d 187, 318 NE2d 562, affd 37 Ohio St 2d 150, 309 NE2d 924 [1973]; Gibbon v Young Women’s Christian Assn., 170 Ohio St 280,164 NE2d 563 [1960]; but see, Albritton v Neighborhood Centers Assn. for Child Dev., 12 Ohio St 3d 210, 466 NE2d 867 [1984] [abolishing common-law doctrine of charitable immunity for nonhospital charities]). The Ohio rule denied immunity in actions based on negligent hiring and supervision, however (see, Gibbon v Young Women’s Christian Assn., supra), whereas New Jersey does not (see, Schultz v Roman Catholic Archdiocese, 95 NJ 530, 472 A2d 531, supra). For this reason, no doubt, defendant Franciscan Brothers does not claim Ohio law governs and the choice is between the law of New York and the law of New Jersey.
As for the locus of the tort, both parties and the dissent implicitly assume it is New York because most of Coakeley’s acts were committed here. Under traditional rules, the law of the place of the wrong governs all substantive issues in the action (see, Kaufman v American Youth Hostels, 5 NY2d 1016), but when the defendant’s negligent conduct occurs in one jurisdiction and the plaintiff’s injuries are suffered in another, the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred (see, Poplar v Bourjois, Inc., 298 NY 62; Conklin v Canadian-Colonial Airways, 266 NY 244; Hunter v Derby Foods, 110 F2d 970 [2d Cir]). Thus, the locus in this case is determined by where the plaintiffs’ injuries occurred.
The first and fourth causes of action, the wrongful death of Christopher and plaintiffs’ own psychological and other injuries respectively, allege injuries inflicted in New Jersey. New York’s only interests in these claims are as the forum State and as the jurisdiction where the tortious conduct underlying plaintiffs’ claims against defendants, i.e., the negligent assignment and failure to dismiss Coakeley, occurred. Standing alone, these interests are insufficient to warrant application of New York law, at least when the relevant issue is a loss-distribution rule, like charitable immunity, rather than one regulating conduct (cf. Long v Pan Am. World Airways, 16 NY2d 337, 342-343). The second and third causes of action seek damages for the psychological, emotional and physical injuries suffered by Christopher and Richard Schultz, injuries which occurred in both New York and New Jersey, because a fair reading of the complaint indicates that both boys suffered injuries when Coakeley molested *196 them and also after they returned home. These two causes of action sufficiently implicate New York’s interests to require a resolution of the choice-of-law problem in the case.
B_
Historically, choice-of-law conflicts in tort actions have been resolved by applying the law of the place of the wrong. In Babcock v Jackson (12 NY2d 473, supra), we departed from traditional doctrine, however, and refused to invariably apply the rule of lex loci delicti to determine the availability of relief for commission of a tort. In doing so, we applied New York law to an action involving New York parties in which recovery was sought for injuries received in an automobile accident in Ontario, Canada. Ontario’s guest statute barred recovery by the plaintiff passenger but we refused to apply Ontario law in the New York action, holding that “controlling effect” must be given “to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation” (Babcock v Jackson, supra, at p 481). Employing this “grouping of contacts” and “interest analysis”, we noted that New York was where the parties were domiciled, where the automobile involved was garaged, licensed and insured, where the guest-host relationship arose and where the trip began and was to end, whereas Ontario’s only contact with the case was the “purely adventitious” occurrence of the accident there (see, Babcock v Jackson, supra, at pp 482-483). Key, however, was New York’s interest in requiring a tort-feasor to compensate his guest for injuries caused by his negligence. That concern would have been completely thwarted if Ontario’s laws were applied to the action, whereas the application of New York’s law would not threaten the policy underlying Ontario’s statute, its interest in preventing fraudulent claims against its defendants and their insurer (see, id., at pp 482-483).
The analysis was flexible and to the extent that it may have placed too much emphasis on contact-counting without specifying the relative significance of those contacts, the necessary refinements were added in later decisions of this court. In four of the five subsequent tort cases presenting the same Babcockstyle fact pattern of common New York domiciliaries and a foreign locus having loss-distribution rules in conflict with those of New York we reached results consistent with Babcock and applied New York law (see, Tooker v Lopez, 24 NY2d 569 [Michigan guest statute]; Miller v Miller, 22 NY2d 12, supra [Maine damage limitation in wrongful death action]; Farber v *197 Smolack, 20 NY2d 198 [North Carolina statute on vicarious liability of automobile owner for negligence of driver]; Macey v Rozbicki, 18 NY2d 289 [Ontario guest statute]). In the fifth case, the first decided after Babcock, we applied the law of the foreign locus, including its restrictive guest statute (see, Dym v Gordon, 16 NY2d 120). Although our opinion in Dym attempted to distinguish Babcock, we subsequently concluded that our reading of the Colorado guest statute in Dym was “mistaken” (see, Tooker v Lopez, 24 NY2d 569, 575, supra). In each of the five cases, however, the court rejected the indiscriminate grouping of contacts, which in Babcock had been a consideration coequal to interest analysis, because it bore no reasonable relation to the underlying policies of conflicting rules of recovery in tort actions (see, Tooker v Lopez, supra, at p 576; Miller v Miller, supra, at pp 15-16). Interest analysis became the relevant analytical approach to choice of law in tort actions in New York. “[T]he law of the jurisdiction having the greatest interest in the litigation will be applied and * * * the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict” (Miller v Miller, supra, at pp 15-16; see also, Tooker v Lopez, supra, at pp 576-577; Macey v Rozbicki, supra, at pp 296-298 [Keating, J., concurring]). Under this formulation, the significant contacts are, almost exclusively, the parties’ domiciles and the locus of the tort (see, Tooker v Lopez, supra, at pp 576-577; id., at pp 584-585 [Fuld, Ch. J., concurring]; Neumeier v Kuehner, 31 NY2d 121, 128 [adopting the three governing rules proposed in Tooker, the first and third of which are pertinent to the facts of this appeal]).
Thus, under present rules, most of the nondomicile and nonlocus contacts relied on in Babcock v Jackson (supra), such as where the guest-host relationship arose and where the journey was to begin and end, are no longer controlling in tort actions involving guest statutes (see, Tooker v Lopez, supra, at pp 577, 579, n 2). Both Tooker and Neumeier continued to place some importance on where the automobile involved was insured (see, Babcock v Jackson, supra, at pp 482-484), but this is not inconsistent with the present rule because usually a defendant host’s automobile will be insured in the State of his domicile and also because it reflects a recognition that the insurer, rather than the individually named defendant, is often “the real party in interest” (Miller v Miller, supra, at p 21). Insofar as issues of liability insurance might also be relevant in a case such as the one before us involving charitable immunity, the record provides no relevant information on the subject.
*198 These decisions also establish that the relative interests of the domicile and locus jurisdictions in having their laws apply will depend on the particular tort issue in conflict in the case. Thus, when the conflicting rules involve the appropriate standards of conduct, rules of the road, for example, the law of the place of the tort “will usually have a predominant, if not exclusive, concern” (Babcock v Jackson, supra, at p 483; see, Restatement [Second] of Conflicts of Law § 145 comment d, at 417-418) because the locus jurisdiction’s interests in protecting the reasonable expectations of the parties who relied on it to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future assume critical importance and outweigh any interests of the common-domicile jurisdiction (see, Babcock v Jackson, supra, at pp 483-484; Restatement [Second] of Conflict of Laws § 145 comment d, at 417-418; id. § 146 comments d, e, at 431-433; see also, Miller v Miller, 22 NY2d 12, 19, supra). Conversely, when the jurisdictions’ conflicting rules relate to allocating losses that result from admittedly tortious conduct, as they do here, rules such as those limiting damages in wrongful death actions, vicarious liability rules, or immunities from suit, considerations of the State’s admonitory interest and party reliance are less important. Under those circumstances, the locus jurisdiction has at best a minimal interest in determining the right of recovery or the extent of the remedy in an action by a foreign domiciliary for injuries resulting from the conduct of a codomiciliary that was tortious under the laws of both jurisdictions (see, Tooker v Lopez, supra, at p 576; Miller v Miller, supra, at pp 18-19; Babcock v Jackson, supra, at p 482). Analysis then favors the jurisdiction of common domicile because of its interest in enforcing the decisions of both parties to accept both the benefits and the burdens of identifying with that jurisdiction and to submit themselves to its authority.[2]
These considerations made the need for change in the lex loci delicti rule obvious in Babcock, but the validity of this interest analysis is more clearly demonstrated in the split domicile case of Neumeier v Kuehner (31 NY2d 121, supra). In Neumeier we applied Ontario’s guest statute in an action on behalf of an Ontario decedent against a New York defendant at least in part because the Ontario statute, which contained reciprocal benefits and burdens depending on one’s status as either host or guest, was “obviously addressed” to Ontario domiciliaries such as *199 plaintiff’s decedent {id., at pp 125-126). In Babcock New York had an important interest in protecting its own residents injured in a foreign State against unfair or anachronistic statutes of that State but it had no similar interest in Neumeier in protecting a guest domiciled in Ontario and injured there.
C_
As to defendant Boy Scouts, this case is but a slight variation of our Babcock line of decisions and differs from them on only two grounds: (1) the issue involved is charitable immunity rather than a guest statute, and (2) it presents a fact pattern which one commentator has characterized as a “reverse” Babcock case because New York is the place of the tort rather than the jurisdiction of the parties’ common domicile (see, Korn, The Choice-of-Law Revolution: A Critique, 83 Colum L Rev 772, 789).
Although most of our major choice-of-law decisions after Babcock involved foreign guest statutes in actions for personal injuries, we have not so limited them, but have applied the Babcock reasoning to other tort issues as well (see, Miller v Miller, 22 NY2d 12, supra [damage limitation in wrongful death action]; Farber v Smolack, 20 NY2d 198, supra [vicarious liability of automobile owner for negligence of driver]; Long v Pam Am. World Airways, 16 NY2d 337, supra [survivor statute and wrongful death damages]; Oltarsh v Aetna Ins. Co., 15 NY2d 111 [statute authorizing direct action against liability insurer]; see also, O’Connor v Lee-Hy Paving Corp., 579 F2d 194 [2d Cir], cert denied 439 US 1034 [1978] [exclusivity of workers’ compensation death benefits for industrial accident]; Rosenthal v Warren, 475 F2d 438 [2d Cir] [damage limitation in wrongful death action], on remand 374 F Supp 522 [SDNY] [charitable immunity]). Nor is there any logical basis for distinguishing guest statutes from other loss-distributing rules because they all share the characteristic of being postevent remedial rules designed to allocate the burden of losses resulting from tortious conduct in which the jurisdiction of the parties’ common domicile has a paramount interest. There is even less reason for distinguishing Babcock here where the conflicting rules involve the defense of charitable immunity (see, Rosenthal v Warren, 374 F Supp 522 [SDNY], supra; Restatement [Second] of Conflict of Laws § 145 comment d; id. § 168 comment b; Korn, supra, at 787, 824). Both plaintiffs and defendant Boy Scouts in this case have chosen to ’ lentify themselves in the most concrete form possible, domicile, with a jurisdiction that has weighed the interests of charitable tort-feasors and their victims and decided *200 to retain the defense of charitable immunity. Significantly, the New Jersey statute excepts from its protection actions by nonbeneficiaries of the charity who suffer injuries as a result of the negligence of its employees or agents (see, NJ Stat Ann § 2A:53A-7). Plaintiffs and their sons, however, were beneficiaries of the Boy Scouts’ charitable activities in New Jersey and should be bound by the benefits and burdens of that choice. Additionally, the State of New Jersey is intimately interested in seeing that the parties’ associational interests are respected and its own loss-distributing rules are enforced so that the underlying policy, which is undoubtedly to encourage the growth of charitable work within its borders, is effectuated.
Thus, if this were a straight Babcock fact pattern, rather than the reverse, we would have no reason to depart from the first Neumeier rule and would apply the law of the parties’ common domicile. Because this case presents the first case for our review in which New York is the forum-locus rather than the parties’ common domicile, however, we consider the reasons most often advanced for applying the law of the forum-locus and those supporting application of the law of the common domicile.
The three reasons most often urged in support of applying the law of the forum-locus in cases such as this are: (1) to protect medical creditors who provided services to injured parties in the locus State, (2) to prevent injured tort victims from becoming public wards in the locus State and (3) the deterrent effect application of locus law has on future tort-feasors in the locus State (see, Comments on Babcock v Jackson, A Recent Development in Conflict of Laws, 63 Colum L Rev 1212, 1222-1226, 1237-1238; Korn, supra, at 841, 962). The first two reasons share common weaknesses. First, in the abstract, neither reason necessarily requires application of the locus jurisdiction’s law, but rather invariably mandates application of the law of the jurisdiction that would either allow recovery or allow the greater recovery (see, Macey v Rozbicki, 18 NY2d 289, 295, supra [Keating, J., concurring]; Dym v Gordon, 16 NY2d 120, 133, supra [Fuld, J., dissenting]). They are subject to criticism, therefore, as being biased in favor of recovery. Second, on the facts of this case neither reason is relevant since the record contains no evidence that there are New York medical creditors or that plaintiffs are or will likely become wards of this State. Finally, although it is conceivable that application of New York’s law in this case would have some deterrent effect on future tortious conduct in this State, New York’s deterrent interest is considerably less because none of the parties is a resident and the rule in conflict is loss-allocating rather than conduct-regulating.
*201 Conversely, there are persuasive reasons for consistently applying the law of the parties’ common domicile. First, it significantly reduces forum-shopping opportunities, because the same law will be applied by the common-domicile and locus jurisdictions, the two most likely forums. Second, it rebuts charges that the forum-locus is biased in favor of its own laws and in favor of rules permitting recovery. Third, the concepts of mutuality and reciprocity support consistent application of the common-domicile law. In any given case, one person could be either plaintiff or defendant and one State could be either the parties’ common domicile or the locus, and yet the applicable law would not change depending on their status. Finally, it produces a rule that is easy to apply and brings a modicum of predictability and certainty to an area of the law needing both.
As to defendant Franciscan Brothers, this action requires an application of the third of the rules set forth in Neumeier because the parties are domiciled in different jurisdictions with conflicting loss-distribution rules and the locus of the tort is New York, a separate jurisdiction. In that situation the law of the place of the tort will normally apply, unless displacing it “ ‘will advance’ the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants’ ” CNeumeier v Kuehner, supra, at p 128). For the same reasons stated in our analysis of the action against defendant Boy Scouts, application of the law of New Jersey in plaintiffs’ action against defendant Franciscan Brothers would further that State’s interest in enforcing the decision of its domiciliaries to accept the burdens as well as the benefits of that State’s loss-distribution tort rules and its interest in promoting the continuation and expansion of defendant’s charitable activities in that State. Conversely, although application of New Jersey’s law may not affirmatively advance the substantive law purposes of New York, it will not frustrate those interests because New York has no significant interest in applying its own law to this dispute. Finally, application of New Jersey law will enhance “the smooth working of the multi-state system” by actually reducing the incentive for forum shopping and it will provide certainty for the litigants whose only reasonable expectation[3] surely would have been that the law of the *202 jurisdiction where plaintiffs are domiciled and defendant sends its teachers would apply, not the law of New York where the parties had only isolated and infrequent contacts as a result of Coakeley’s position as Boy Scout leader. Thus, we conclude that defendant Franciscan Brothers has met its burden of demonstrating that the law of New Jersey, rather than the law of New York, should govern plaintiffs’ action against it.
Ill
Plaintiffs contend that even if the New Jersey charitable immunity statute is applicable to this action, it should not be enforced because it is contrary to the public policy of New York.
The public policy doctrine is an exception to implementing an otherwise applicable choice of law in which the forum refuses to apply a portion of foreign law because it is contrary or repugnant to its State’s own public policy (see, Paulsen & Sovern, “Public Policy” in the Conflict of Laws, 56 Colum L Rev 969). The doctrine is considered only after the court has determined that the applicable substantive law under relevant choice-of-law principles is not the forum’s law. Having found that, the court must enforce the foreign law “unless some sound reason of public policy makes it unwise for us to lend our aid” (Loucks v Standard Oil Co., 224 NY 99, 110 [Cardozo, J.]).
The party seeking to invoke the doctrine has the burden of proving that the foreign law is contrary to New York public policy. It is a heavy burden for public policy is not measured by individual notions of expediency and fairness or by a showing that the foreign law is unreasonable or unwise (Loucks v Standard Oil Co., supra, at p 111). Public policy is found in the State’s Constitution, statutes and judicial decisions and the proponent of the exception must establish that to enforce the foreign law “would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal” expressed in them (Loucks v Standard Oil Co., supra, at p 111; see also, Matter of Walker, 64 NY2d 354; Shannon v Irving Trust Co., 275 NY 95, 103). In addition, the proponent must establish that there are enough important contacts between the parties, the occurrence and the New York forum to implicate our public policy and thus preclude enforcement of the foreign law (see, Paulsen & Sovern, supra, at 981).[4]
*203 When we have employed the exception in the past and refused to enforce otherwise applicable foreign law, the contacts between the New York forum, the parties and the transaction involved were substantial enough to threaten our public policy. Thus, in Kilberg v Northeast Airlines (9 NY2d 34), we found the law of the place of tort, Massachusetts, appropriate to a wrongful death action but refused to apply its statutory limit on damages because it was contrary to New York public policy, expressed in our State Constitution, prohibiting limitations on such damages. Insofar as the decedent was a resident, who had purchased his ticket and boarded his flight in New York and the defendant carried on extensive operations here, New York’s interest in providing its residents with full compensation for wrongful death was jeopardized and led us to reject the Massachusetts limitation.
Similarly, in Mertz v Mertz (271 NY 466) and Straus & Co. v Canadian Pac. Ry. Co. (254 NY 407), this State’s public policy was seriously threatened because it was intimately connected to the parties and the transaction. In Mertz we refused to follow Connecticut law that permitted a wife to sue her husband for negligently inflicted injuries caused there because New York’s law was just the opposite and the parties were both New York domiciliaries. In Straus & Co., we refused to enforce a contractual provision releasing the defendant shipper from liability for its own negligence, valid under otherwise applicable British law but invalid under the laws of New York, when the plaintiff was a New York company, the final place of shipment was New York, and the defendant had chosen to do business here by way of shipping goods into the State.
Thus, although New York discarded the doctrine of charitable immunity long ago (see, Bing v Thunig, 2 NY2d 656, 667) and enforcement of New Jersey’s statute might well run counter to our fundamental public policy, we need not decide that issue because there are not sufficient contacts between New York, the parties and the transactions involved to implicate our public policy and call for its enforcement.
*204 IV
Finally, defendants contend that inasmuch as New Jersey law governs this action, plaintiffs are estopped under the doctrine of third-party issue preclusion from relitigating the effect of the New Jersey charitable immunity statute by their earlier New Jersey court action.
The full faith and credit clause of the Federal Constitution requires the courts of each State to give to the judgments of other States the same conclusive effect between the parties as such judgments are given in the States in which they are rendered (Semler v Psychiatric Inst., 575 F2d 922, 927 [DC Cir]; see, Durfee v Duke, 375 US 106, 109; Restatement [Second] of Conflict of Laws § 95). Our decision therefore will be determined by whether the courts of New Jersey would hold plaintiffs barred by the prior action.
New Jersey has adopted the general principles governing third-party issue preclusion set forth in Restatement (Second) of Judgments § 29 (see, State v Gonzalez, 75 NJ 181, 188-190, 380 A2d 1128, 1132; United Rental Equip. Co. v Aetna Life & Cas. Ins. Co., 74 NJ 92, 101, 376 A2d 1183, 1188). For collateral estoppel to apply, therefore, three criteria must be met: (1) the issue must actually have been litigated and determined by a valid and final judgment in a separate action, (2) that determination must have been essential to the judgment and (3) either the party to be precluded had a full and fair opportunity to litigate the issue in the prior proceeding or other circumstances do not justify affording him an opportunity to relitigate it (see, Restatement [Second] of Judgments §§ 27, 29; State v Gonzalez, supra, at pp 188-192, at pp 1132-1133; see also, Koch v Consolidated Edison Co., 62 NY2d 548, 554-555).
The issue presented to us, whether plaintiffs’ claims against these defendants are barred by the New Jersey charitable immunity statute, was actually litigated and determined by a final judgment of its courts. A comparison of plaintiffs’ complaint in the New Jersey action and the one before us demonstrate that they are the same except for minor differences reflecting the different defendants. One of the specific issues contested in New Jersey was whether its statute provided immunity in actions alleging negligent hiring and supervision and the court dismissed the complaint (Schultz v Roman Catholic Archdiocese, 95 NJ 530, 472 A2d 531, supra). Moreover, plaintiffs have never disputed that defendants are charitable organizations entitled to the protection of the New Jersey statute, nor have they presented any facts warranting a conclusion that they *205 lacked a full and fair opportunity to litigate the issue in the prior action or that other circumstances justify according them an opportunity to relitigate it in New York. On the contrary, the record indicates that plaintiffs relied on their New Jersey action and vigorously pursued their claims there. Although they commenced this action approximately one month before the one in New Jersey, plaintiffs requested and obtained a stay of it pending final determination of their New Jersey action and they were given the opportunity to fully present their arguments against application of the charitable immunity statute before that State’s highest court. Plaintiffs are correct that collateral estoppel would not apply if we applied New York law or refused to enforce the New Jersey statute on public policy grounds (see, State v Gonzalez, supra, at pp 188-192, at pp 1132-1133; Schwartz v Public Administrator, 24 NY2d 65, 72; Restatement [Second] of Judgments § 29 [7]). We have resolved those issues against them, however.
Accordingly, the order of the Appellate Division should be affirmed, with costs.

. Edmund Coakeley, Peter Grandy and the Pine Creek Reservation were also named as defendants in the action. Grandy died after it was commenced and Coakeley never appeared.

. New York’s rule holding charities liable for their tortious acts, or its rule of nonimmunity as the dissent characterizes it, is also a loss-allocating rule, just as New Jersey’s charitable immunity statute is.

. As the dissent notes, we rejected the notion that the parties’ reasonable expectations of the applicable law was determinative in Miller v Miller (22 NY2d 12) and Tooker v Lopez (24 NY2d 569). Our discussion here is limited to application of the “uncertainty” standard of the third of the Neumeier rules (see, Neumeier v Kuehner, 31 NY2d 121, 128-129) to defendant Franciscan Brothers.

. The United States Supreme Court has recently reaffirmed that “the Full Faith and Credit Clause does not require a State to apply another State’s law in violation of its own legitimate public policy” (Nevada v Hall, 440 US 410, 422). It has also stated unequivocally that for a State to either choose its *203 substantive law or refuse to apply a sister State’s law “in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair” (Allstate Ins. Co. v Hague, 449 US 302, 313; see, id.., at p 308, and n 10; see also, John Hancock Mut. Life Ins. Co. v Yates, 299 US 178; Home Ins. Co. v Dick, 281 US 397). There thus is some doubt whether we could constitutionally choose to apply New York law in this case although in view of our disposition we need not decide the question.